## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, <br><br>     *Plaintiffs*, <br><br> v. <br><br> BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, <br><br>     *Defendants*. | CIVIL ACTION <br><br> FILE NO. 1:21-CV-01284-JPB |

## STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## INTRODUCTION

Despite celebrating the 2020 election as "safe and secure" and praising the "integrity" of that election, including its high turnout, [Doc. 1, ¶¶ 15-16], Plaintiffs assail SB 202 as nothing less than part of Georgia's "*unrelenting . . . effort to suppress the political participation of people of color.*" [Doc. 1, ¶ 8] (emphasis added). And not only that—Plaintiffs make the breathtaking charge that SB 202 is "an attack on democracy itself." [Doc. 1, ¶ 25].

But the reality of SB 202 is nowhere near this hypercharged rhetoric.[1] As discussed below, SB 202 added opportunities to vote and put in place meaningful and necessary reforms to help ensure the very interests Plaintiffs praise—a "safe and secure" election with "integrity" and continued high turnout. Further, the changes it makes are well within the mainstream of other states' laws related to elections and are more voting-friendly than laws in many states.

---

[1] Plaintiff AME Church is also a plaintiff in *Fair Fight Action v. Raffensperger*, Case No. 1:18-cv-05391-SCJ (N.D. Ga.). While now saying that claims about the integrity of the 2020 election—including claims of "switched" votes on voting machines—are "groundless," [Doc. 1, ¶ 153], AME Church alleged switching of votes on voting machines in the 2018 election and its co-plaintiffs questioned the "integrity of the elections systems" in 2018. Amended Complaint, *Fair Fight Action,* Doc. 41, ¶¶ 23, 102-104. Other practices Plaintiffs in this case claim are "discriminatory," like list maintenance and polling place closures, [Doc. 1, ¶¶ 105-108, 116-121], were dismissed in *Fair Fight Action. See* Order, Doc. 612, pp. 36-42; Doc. 617, pp. 46-56.

Plaintiffs nevertheless ask this Court to advance their political agenda by invalidating several provisions of SB 202. But that is not the purview of the courts. As the Eleventh Circuit recently explained, "the Constitution sets out [the] sphere of [federal courts'] decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight").

As a threshold matter, Plaintiffs do not have Article III standing to invoke this Court's limited jurisdiction over state election laws because they have not alleged a sufficient injury—just like the litany of post-2020 cases that were properly dismissed based on standing.

But even if this Court reaches the merits, there is no case here. SB 202[2] was the legislature's reasonable update of Georgia election laws, recognizing that "[t]he stress of the 2020 elections, with a dramatic increase in absentee-by-mail ballots and pandemic restrictions, demonstrated where there were opportunities to update existing processes to reduce the burden on election

_____

[2] A copy of SB 202 is attached as Exhibit A, with references to page and line numbers.

officials and boost voter confidence." Ex. A at 4:76-78. Far from being an "attack on democracy," SB 202 updated Georgia election law "to make it 'easy to vote and hard to cheat,' applying the lessons learned from conducting an election in the 2020 pandemic." Ex. A at 6:146-7:148.

This Court should "follow the law as written and leave the policy decisions for others," *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Reg. & Elections*, No. 1:20-CV-01587, 2020 U.S. Dist. LEXIS 211736, at *4 (N.D. Ga. Oct. 5, 2020) ("*GALEO*"), and dismiss this case.

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs ask this Court to nullify seven components of Georgia's new election law as violations of Section 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments. *See generally* [Doc. 1]. Because Plaintiffs challenge a variety of practices, this brief first considers standing, explains the legal standards, and then considers the challenged practices.

The pertinent legal standards are clear:  Where a motion to dismiss is brought pursuant to FRCP 12(b)(1), the Court is not limited to the four corners of the Complaint to adequately satisfy itself of jurisdiction over the matter. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 732 n.9 (11th Cir. 1982). In evaluating a 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations." *Id*.  And, to survive a motion to dismiss under FRCP

12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions "couched as [] factual allegation[s]." *Id.* at 678-79. This Court may consider any matters appropriate for judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Application of these settled standards requires dismissal.

## I.   Plaintiffs do not have standing.

One ground for dismissal is lack of standing. As the Eleventh Circuit explained recently, "Federal courts are not 'constituted as free-wheeling enforcers of the Constitution and laws.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006)). Instead, Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. Art. III § 2. And "[t]o have a case or controversy, a litigant must establish that he has standing." *Jacobson v. Fla. Sec. of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

To demonstrate standing at the pleading stage of the litigation, Plaintiffs

must allege "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson*, 974 F.3d at 1245. The party invoking federal jurisdiction bears the burden of establishing standing at the start of the lawsuit and at each phase of the litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992); *see also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001). Plaintiffs, moreover, must show a concrete and particularized injury. *Wood*, 981 F.3d at 1314 (citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020)). And there must be a substantial risk of injury or it must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

Organizations can establish an injury either by (1) showing they diverted resources in response to the purportedly illegal acts of State Defendants, or (2) "stepping in the shoes" of its members. Utilizing either of these paths requires Plaintiffs to otherwise satisfy the remaining elements of standing—and those elements are not satisfied here.

## A.     The organizational plaintiffs have no injury.

### 1.     *Diversion of resources.*

A plaintiff claiming diversion of resources as an injury must demonstrate that "a defendant's illegal acts impair the organization's ability to engage in

its own projects by forcing the organization to divert resources in response." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014). This requires the plaintiff to show not only what the organization is diverting resources *to*, but also "what activities [the organization] would divert resources away *from* in order to spend additional resources on combatting" the impact of the law. *Jacobson*, 974 F.3d at 1250. As another judge on this court held, this requires more than evidence of an accounting transfer: there must be an "indication" that the organization "would in fact be diverting . . . resources *away from their core activities*." *GALEO*, 2020 U.S. Dist. LEXIS 211736,[3] at *17 (emphasis added). Or, as the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are already doing." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019). Further, organizations "cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted." *Id.* (cleaned up). Organizations must demonstrate that the challenged law's effect "goes far beyond 'business as usual'" through evidence of a disruption in their operations or the likelihood of significant

---

[3] Plaintiffs appealed this dismissal and it is pending in the Eleventh Circuit.

changes to their activities. *Id*.

In *GALEO*, for example, the plaintiff alleged it had standing because it was forced to divert resources "from getting out the vote and voter education to 'reach out to and educate [limited English proficiency voters] about how to navigate the mail voting process… as well as other aspects of the electoral process." *GALEO*, 2020 U.S. Dist. LEXIS 211736 at *17. But GALEO's mission included "organizing voter education, civic engagement, [and] voter empowerment." *Id*. The district court dismissed the case and found "there is no indication that GALEO would in fact be diverting any resources away from the core activities it already engages in by continuing to educate and inform Latino voters." *Id*. And allegations of ostensibly new or additional efforts were "precisely of the same nature as those that GALEO engaged in before…" *Id*.

The same is true here. Taking the allegations in the Complaint as true, there is no "indication" that the alleged actions thus far undertaken—or those they claim will be taken later—are different in nature from what Plaintiffs already engaged in before SB 202. Plaintiffs AME Church, GAMVP, WWA, Delta Sigma Theta Sorority, and LCF all share broadly similar missions, and are all alleging they have standing because they are devoting time and resources to "combat[ing] the suppressive effects of SB 202." [Doc. 1, ¶¶ 26–38]. But AME Church's mission supports "civic participation among its

members [as] a core aspect" of its work. *Id.* ¶ 27. They also host, "'Get Out The Vote' ('GOTV') efforts to increase voter turnout." *Id.* Likewise, GAMVP "holds voter registration drives, civic engagement workshops," among other voting-centric activities. *Id.* at ¶ 30. "WWA runs a robust civic engagement program that includes Voting and Civil Rights Awareness Trainings…" *Id.* at ¶ 32. Delta Sigma Theta Sorority, Inc., alleges that "[c]ivic engagement has remained a core tenet" of the organization since its inception over 100 years ago. *Id.* at ¶ 34. Finally, LCF claims a core part of its mission is "the translation of materials, civic engagement training, voter education materials regarding absentee voting, early voting, and voting by drop box." *Id.* at ¶ 37.

Therefore, the allegations contained in the Complaint of new or added efforts are "precisely of the same nature as those that [the organizational Plaintiffs] engaged in before . . ." *GALEO*, 2020 U.S. Dist. LEXIS 211736 at *17. While Plaintiffs are obviously not fans of SB 202, any alleged efforts they plan to make are, by their own description, in line with the kinds of efforts they engage in every day. And, for that reason, although Plaintiffs allege they are *spending* resources as a result of SB 202, they are not *diverting* resources for purposes of standing. As a result, their Complaint should be dismissed.

### 2.    *Associational standing.*

Plaintiff Delta Sigma Theta also alleges that it has members whose right

8

to vote will be burdened by SB 202.[4] [Doc. 1, ¶ 36]. To the extent it makes this allegation to establish associational standing, it fails. To establish associational standing, the Supreme Court has held that—at a minimum— "plaintiff-organizations [must] make specific allegations establishing that at least one *identified* member [has] suffered or [will] suffer harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009) (emphasis added)*; Republican Party v. SEC*, 888 F.3d 1198, 1203-05 (11th Cir. 2018) (overturning past precedent allowing associational standing to be proved without identifying specific members who will be harmed). Delta Sigma Theta has not done so.

In addition, any potential injury faced by its members is too speculative to support standing here because any injury is not concrete and particularized. *See Tsao v. Captiva MVP Rest. Partners, LLC.*, 986 F.3d 1332, 1339 (11th Cir. 2021); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc). Any injury to a member is based solely on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, and cannot establish standing on an associational basis because the members do not have standing to sue in their own right. *United Food & Commer. Workers Union Local 751 v. Brown Grp.*,

---

[4] While AME Church alleges it has members whose right to vote will be burdened, [Doc. 1, ¶ 28], it earlier only alleged that it has member *churches*, not *individuals*, so associational standing is not available. *Id*. at ¶¶ 26-27.

517 U.S. 544, 553, 116 S. Ct. 1529, 1534 (1996); *Wood*, 981 F.3d at 1314 (no concrete injury to individual voter); *Bognet v. Sec'y Pa.*, 980 F.3d 336, 356 (3d Cir. 2020) (same). For this reason, dismissal is also required.

### B. Plaintiffs challenge processes that are neither traceable to nor redressable by State Defendants.

Even if this Court found Plaintiffs have diverted resources sufficient to establish an injury, many of Plaintiffs' claims should be dismissed anyway because they cannot establish that the alleged injuries are traceable to State Defendants. To satisfy the causation requirement of standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. For example, Plaintiffs challenge language in SB 202 that "codifies the right to bring unlimited challenges" to voters' registration status. [Doc. 1, ¶ 216]. But such challenges are brought and heard at the county level. *See, e.g.* O.C.G.A. § 21-2-229, *et seq*. As a result, the Governor, the Secretary of State, and the State Election Board have no discretion under the law to alter or amend such processes. And a ruling from this Court instructing them to do so will not change that fact, because "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury." *Lewis v. Governor of Ala.,* 944 F.3d

1287, 1301 (11th Cir. 2019) (en banc) (cleaned up and emphasis in original).
Similarly, Plaintiffs' claims relating to the "rejection rate of absentee ballots"
and alleged "long lines" at polling places are outside the scope of State
Defendants' authority and, thus, this Court's capacity to redress here. *See Ga.
Repub. Party, Inc. v. Ga. Sec'y of State*, No. 20-14741-RR, 2020 U.S. App.
LEXIS 39969, at *6 (11th Cir. Dec. 20, 2020); *Anderson v. Raffensperger*, No.
1:20-cv-03263, 2020 U.S. Dist. LEXIS 188677, at *61 (N.D. Ga. Oct. 13, 2020).

## II.    Plaintiffs fail to state a claim on which relief can be granted.

Plaintiffs' claims must also be dismissed on the merits.

### A.    Relevant legal standards.

#### 1.    *Section 2 of the Voting Rights Act (Count I)*

Section 2 of the Voting Rights Act prohibits jurisdictions from
"impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or
standard, practice, or procedure . . . which results in a denial or abridgement
of the right of any citizen of the United States to vote on account of race or
color[.]" 52 U.S.C. § 10301(a). "This analysis turns on whether, based on the
totality of the circumstances, the challenged law violates Section 2(a) because
it deprives minority voters of an equal opportunity to participate in the
electoral process *and* to elect representatives of their choice." *Greater
Birmingham Min. v. Sec'y of Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021)

(emphasis in original). To make out a valid vote-denial[5] claim, the Eleventh Circuit requires (1) proof of disparate impact (a law results in a denial or abridgement) and (2) that the disparate impact is *caused* by racial bias. *Id*.; *see also Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 626-27 (6th Cir. 2016); *Dem. Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1012 (9th Cir. 2020); *Veasey*, 830 F.3d at 243-245; *League of Women Voters*, 769 F.3d at 240.

> 2.   *Intentional racial discrimination (Counts II and III).*

Plaintiffs bring two intentional-discrimination counts: under the Equal Protection Clause of the Fourteenth Amendment and under the Fifteenth Amendment. [Doc. 1, ¶¶ 248-253]. Plaintiffs must allege first that "the State's decision or act had a discriminatory purpose and effect. . . . If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail." *Greater Birmingham Min.*, 992 F.3d at 1321 (cleaned up and emphasis in original). Only if Plaintiffs establish that the State's act had a discriminatory intent or effect does "the burden shift[] to the law's defenders to demonstrate that the law would have been enacted without this [racial-discrimination] factor." *Id.* quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also*

---

[5] Unlike vote-dilution claims that challenge district boundaries, vote-denial claims challenge specific election practices. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 239 (4th Cir. 2014); *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

*Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005). Courts use the multi-factor[6] approach of *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977), to assess intent and effect.

### 3.    *Fundamental right to vote (Count IV).*

Plaintiffs challenge seven regulations as facially unconstitutional. But facial challenges to election practices are disfavored because "the proper [judicial] remedy—even assuming [the law imposes] an unjustified burden on some voters—[is not] to invalidate the entire statute. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008) (controlling opinion) (cleaned up). Such challenges "must fail where the statute has a plainly legitimate sweep." *Washington State Grange v. Washington State Republican* Party, 552 U.S. 442, 449 (2008). "Regulations imposing severe burdens on the plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a state's 'important regulatory interests' will usually be enough to justify 'reasonable nondiscriminatory

---

[6] The Eleventh Circuit summarized these factors as "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Greater Birmingham Min.*, 992 F.3d at 1322.

restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Although there is no "litmus test," courts distinguish severe burdens from non-severe ones, and ordinary burdens such as photo identification laws that "aris[e] from life's vagaries," and thus fall into the latter category. *Crawford*, 553 U.S. at 191, 197-98 (controlling opinion). Significantly, lesser burdens impose no burden of proof or evidentiary showing on states. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009), *see also Munro*, 479 U.S. at 195.

4.     *Freedom of speech/expression (Count V).*

Plaintiffs bring their challenge to the prohibition against providing things of value to voters in line as a violation of the First Amendment's protections for "core political speech." [Doc. 1, ¶ 261]. But the prohibition they challenge only applies in a specific location, meaning the First Amendment claim must be evaluated based on the forum. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U. S. 672, 678 (1992). On Election Day, a precinct is "a government-controlled property set aside for the sole purpose of voting." *Mansky*, 138 S. Ct. at 1886. As a result, the "nonpublic forum standard" applies and the sole question is whether the provisions of SB 202 related to food and drink in line are

14

"'reasonable in light of the purpose served by the forum': voting." *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U. S. 788, 806 (1985)). Further, there is "no requirement of narrow tailoring in a nonpublic forum." *Id.* at 1888.

### B.   Application to particular challenged practices.

Georgia's compelling interests in enacting SB 202 include: (1) "deterring and detecting voter fraud"; (2) "participating in a nationwide effort to improve . . . election procedures";  (3) "safeguarding voter confidence"; (4) "conducting an efficient election"; and (5) "maintaining order." *New Ga. Project*, 976 F.3d at 1282; *Greater Birmingham Min.*, 992 F.3d at 1319. In light of those interests, each of Plaintiffs' challenges fails as a matter of law.

#### 1.   Prohibition on mobile voting.

Plaintiffs begin with an attack on the limitations placed on mobile-voting locations, which were utilized by one county for the first time in the 2020 elections to mitigate the effects of the COVID-19 pandemic. [Doc. 1, ¶¶ 174-176]. SB 202 specifically allows mobile voting units when needed in emergency situations, Ex. A at 31:774-778, but the limitations are consistent with other provisions that require specific advance notice of the location of a precinct, not an ever-shifting bus traveling around the county. Ex. A at 30:741-757 (posted notice of precinct change), 60:1525-1535 (notice of early-voting location). Other

than a conclusory allegation that limiting mobile units will "unduly and especially burden[] voters of color," apparently relying on the demographic makeup of Fulton County, [Doc. 1, ¶ 204], Plaintiffs do not identify any disparate impact or burden imposed by limiting an optional system used in an unusual election by one county. Plaintiffs fail to connect this claimed disparate impact of this particular provision of SB 202 with a "denial or abridgement of the right to vote on account of race." *Greater Birmingham Min.*, 992 F.3d at 1329. Without meeting this causal requirement, Plaintiffs have failed to state a claim under Section 2.

Further, the state's regulatory interests in orderly election administration, uniformity, precinct predictability, and voter confidence justify any slight burden on the right to vote by limitations placed on removing an option one county used on one election, eliminating Plaintiffs' fundamental-right-to-vote claim. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020). Plaintiffs apparently do not challenge this provision as intentionally discriminatory or as a violation of the First Amendment.

2.  *Identification requirements for requesting absentee ballots.*

Plaintiffs take issue with the use of an identification number for

absentee ballot applications.[7] [Doc. 1, ¶¶ 177-181, 244]. The General Assembly explained that the prior signature-matching process was subjective and challenged by both Democratic and Republican groups. Ex. A at 4:73-75. The SB 202 process is objective and includes safeguards for voters who lack identification. Ex. A at 38:949-39:956; 51:1297-52:1305. Plaintiffs allege that there is a disproportionate impact on minority voters, [Doc. 1, ¶¶ 206-210], but the Eleventh Circuit and Supreme Court have already determined there is no unconstitutional burden on the right to vote by requiring photo identification. *Crawford*, 553 U.S. at 181; *Greater Birmingham Min.*, 992 F.3d at 1320. Thus, even if there is a slight burden, it is more than justified by the state's regulatory interests. SB 202's verification requirement closely matches the voter-identification requirements of federal law when registering to vote by mail, which Plaintiffs do not challenge. *See* 52 U.S.C.S. § 21083(b)(2).

Plaintiffs also do not allege that this purported disparate impact, [Doc. 1, ¶¶ 206-210], will cause "the denial or abridgement of the right to vote on account of race." *Greater Birmingham Min.*, 992 F.3d at 1329. Without meeting this causal requirement, Plaintiffs have failed to state a claim under Section

---

[7] Also, at least six other states utilize identification with absentee-ballot applications or ballots. *See* Code of Ala. § 17-9-30(b); A.C.A. § 7-5-412(a)(2)(B) (Arkansas); K.S.A. § 25-1122(c) (Kansas); Minn. Stat. Ann. § 203B.07(3); Ohio Rev. Code Ann. § 3509.03(B), .04(B); Wis. Stat. § 6.87(1).

2. Plaintiffs apparently do not challenge this provision as intentionally discriminatory or as a violation of the First Amendment.

### 3. Identification requirements for casting absentee ballots.

Plaintiffs make the same complaints about the requirement of using identification for the return of absentee ballots. [Doc. 1, ¶¶ 182-185, 244]. Like the allegations for absentee-ballot applications, Plaintiffs' allegations do not support an "unjustified leap from *the disparate inconveniences* that voters face when voting to *the denial or abridgement of the right to vote*" for purposes of a Section 2 claim. *Greater Birmingham Min.*, 992 F.3d at 1330 (cleaned up). Plaintiffs have also not alleged any burden on the right to vote that is not justified by the state's regulatory interests, *Crawford*, 553 U.S. at 181, and do not appear to be challenging this provision as intentionally discriminatory or a violation of the First Amendment.

### 4. Parameters on the use of drop boxes.

Plaintiffs also challenge "restrictions" on outdoor drop boxes, [Doc. 1, ¶¶ 186-193, 244]—a voting method that did not exist in Georgia law prior to SB 202 and was only *optional* in 2020 under an emergency rule designed as a temporary public-health measure due to the risks—known and unknown— posed by COVID-19. Ex. A at 5:113-118; Ga. Comp. R. & Regs. r. 183-1-14-0.8-.14; 183-1-14-0.10-.16; 183-1-14-.08-.14; *see also* O.C.G.A. § 50-13-4(b). SB 202

*requires*[8] every county to have at least one drop box and allows them to be moved outside during emergencies. Ex. A at 47:1172-1174, 1188-1191. The sole race-related claim (apart from a conclusory introductory statement) is that Black voters will be deterred because of the in-person surveillance requirements for boxes.[9] [Doc. 1, ¶¶ 213, 214]. But there is no right to vote in any particular manner, *Burdick*, 504 U.S. at 433, and the elimination[10] of some pieces of voting access, while retaining others, is a minimal burden at best, *Ohio Democratic Party v. Husted*, 834 F.3d 620, 630 (6th Cir. 2016). And where there are multiple options from which a voter can select, the right to vote is not implicated at all. *See, e.g., New Ga. Project*, 976 F.3d at 1281. In SB 202, Georgia expanded the number of mandatory early-voting days, maintained no-excuse absentee balloting, and required drop boxes in every county. Plaintiffs fail to show that the State's first-ever statutory authorization of drop boxes places any burden whatsoever on the right to vote—the fact that SB 202 arguably may not be as expansive as a temporary emergency rule (which expired before the 2022 election cycle will commence) is more than justified by

---

[8] The emergency rules adopted by the State Election Board merely *permitted* a county to establish drop boxes but did not *require* that they have one.

[9] The emergency rules required continuous video surveillance of drop boxes.

[10] Given the large number of locations to drop off mail, which is the primary option for returning absentee ballots, O.C.G.A. § 21-2-385(a) ("personally mail or personally deliver"), there is no elimination of any access in SB 202.

the state's regulatory interests. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

The claim of intimidation may be the closest Plaintiffs get to alleging that this claimed disparate impact from this provision of SB 202 "cause[s] the denial or abridgement of the right to vote on account of race." *Greater Birmingham Min.*, 992 F.3d at 1329. But they still have not adequately pleaded this requirement and thus have failed to state a claim under Section 2. Plaintiffs apparently do not challenge this provision as intentionally discriminatory or as a violation of the First Amendment.

> 5. *Shortening runoff elections.*

Plaintiffs next challenge the shortening of the timeline for runoff elections. [Doc. 1, ¶¶ 194, 244]. Again, there is nothing unusual about a four-week runoff—this was already true for all runoffs in Georgia before a 2014 change to federal elections after a court decision,[11] and state offices still utilized a four-week runoff after that. O.C.G.A. § 21-2-501(a)(3) and (4) (2020). SB 202 adopted a system similar to that used in Alabama, which uses ranked-choice voting for overseas voters to hold runoffs on the same four-week

---

[11] Extended runoffs were required for federal offices due to federal-law requirements for overseas and military voters. *See U.S. v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012).

timeline. *See* Code of Ala. §§ 17-13-8.1 (instant runoff voting ballots); 17-13-18 (runoff on fourth Tuesday after election). Plaintiffs' only complaint about this change is that it shortens the early-voting period, [Doc. 1, ¶ 221], but SB 202 leaves the current early-voting period for four-week runoffs in place—it just provides for *all* runoffs to be held then. Additionally, there is no right to early voting and any changes are only minimally burdensome. *Ohio Democratic Party*, 834 F.3d at 631. As a result, the State's interests in "easing the burden on election officials and on electors," Ex. A at 5:119-6:122, more than justify the changes. *See Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998).

Further, Plaintiffs make only a passing reference to this change having any disparate impact on minority voters, [Doc. 1, ¶ 201], dooming any Section 2 claim. *Greater Birmingham Min.*, 992 F.3d at 1329. Plaintiffs apparently do not challenge this provision as intentionally discriminatory or as a violation of the First Amendment.

6.     *Ban on giving anything of value inside the 150-foot zone.*

Plaintiffs spend a large portion of their Complaint focused on the prohibition on third parties giving anything of value to voters in line. [Doc. 1, ¶¶ 195-197]. The General Assembly explained that "many groups" approached voters in line during the 2020 elections and clarified the rules around electioneering within 150 feet of a polling place because of the importance of

"[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote." Ex. A at 6:126-129. Otherwise, offering or approaching voters with things of value almost certainly would be or could be seen as a pretext (or worse) for buying votes or conducting unlawful electioneering.[12] This is not unusual among states—New York has a similar prohibition on providing food or drink to voters, NY CLS Elec § 17-140, and the Supreme Court has recognized that campaign speech can be restricted near polling locations and precincts. *Mansky*, 138 S. Ct. at 1886; *Burson v. Freeman*, 504 U.S. 191, 193-94 (1992). The important regulatory interests of the state more than justify the minimal burden of a voter not being approached in line with an offer of food from a third party.[13] *Common Cause*, 554 F.3d at 1354; *Gwinnett Cty. NAACP*, 446 F. Supp. 3d at 1124.

The sole allegation of a disparate racial impact related to this provision is that voters of color tend to wait in longer lines. [Doc. 1, ¶¶ 223, 224-232]. But, as noted above, long lines are not an injury traceable to State Defendants. *Anderson*, 2020 U.S. Dist. LEXIS 188677, at *64. Without this causal

---

[12] Notably, Plaintiffs do not challenge the constitutionality of Georgia's long-standing bans on electioneering within 150 feet of the polling place or on candidates not being present within 150 feet of a polling place except to vote.

[13] Voters can still receive water from a cooler stationed within the 150-feet buffer and SB 202 specifically requires election officials to make changes to avoid long lines during in-person voting. Ex. A at 74:1887-1889; 29:721-734.

connection, the Section 2 claim related to the restrictions on providing something of value to voters in line evaporates. *Greater Birmingham Min.*, 992 F.3d at 1329.

Finally, the First Amendment claims fail as well. The sole question about the nonpublic forum of a voting location is whether the General Assembly's goal of "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote," Ex. A at 6:126-129, is "'reasonable in light of the purpose served by the forum': voting." *Mansky*, 138 S. Ct. at 1886 (quoting *Cornelius*, 473 U.S. at 806). Given the broad protections and context of the restriction, it is eminently reasonable—Plaintiffs can approach voters and offer food and water anywhere outside 150 feet—and Georgia is not required to find the most narrowly tailored solution. *Id.* at 1888. As a result, Plaintiffs have failed to state a claim for relief under the First Amendment.

### 7. *Parameters for casting out-of-precinct provisional ballots.*

Plaintiffs challenge the limitations placed on out-of-precinct ballots. [Doc. 1, ¶¶ 198-200, 218-219]. But almost half of the States do not count a provisional ballot cast out of precinct at all.[14] Georgia legislators explained that

---

[14] *Provisional Ballots*, National Conference of State Legislatures (September 17, 2020) *available at* https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx#partial

voters who vote out of precinct "add to the burden on election officials and lines for other electors because of the length of time it takes to process a provisional ballot in a precinct" and that not voting in the proper precinct prevents voters from voting "in all elections for which they are eligible," Ex. A at 6:135-138. The statutory provision also explicitly permits the counting of out-of-precinct ballots for voters who cannot get to their home precinct before 7:00 P.M. *Id.* at 75:1914-1919. The sole allegation from Plaintiffs is that moving within the county is more likely to lead to appearing at the wrong precinct, [Doc. 1, ¶ 219]—but SB 202 expressly requires the voter to be *directed* to his or her correct precinct if it is before 5:00 P.M. Ex. A at 74:1902-75:1907. Given opportunities to vote ahead of Election Day and after 5:00 P.M. out of precinct on Election Day, any burden is minimal at best and justified by the State's interests. *Ohio Democratic Party*, 834 F.3d at 630.

Plaintiffs also do not allege that this claimed disparate impact from this provision of SB 202 "caused the denial or abridgement of the right to vote on account of race." *Greater Birmingham Min.*, 992 F.3d at 1329. Without meeting this causal requirement, Plaintiffs have failed to state a claim under Section 2. Plaintiffs apparently do not challenge this provision as intentionally discriminatory or as a violation of the First Amendment.

*8.     Cumulative intentional racial discrimination.*

Finally, Plaintiffs throw in the claim that everything in SB 202 put together is discriminatory. [Doc. 1, ¶ 201]. But, like the plaintiffs in *Greater Birmingham Min.* whose proof was insufficient, even assuming everything in the Complaint is true, they have not sufficiently alleged the factors in *Arlington Heights*, 429 U.S. at 266. The alleged impacts are minimal at best, the history relied on is far distant, the legislation went through normal channels, and the legislature explained exactly what it was doing in the first pages of the bill—and none of the statements by the legislature itself were racially discriminatory. *Compare* [Doc. 1] and Ex. A, 4:69-7:148 *with Greater Birmingham Min.*, 992 F.3d at 1321-1328.

## CONCLUSION

SB 202 is a reasonable regulation of election processes—protecting the foundation of democracy by ensuring safe and secure elections. Plaintiffs' attack on the State's constitutional power to regulate elections fails because they lack standing to challenge SB 202, but even if they have alleged an injury, there is no basis for their claims. The Court should dismiss this case.

Respectfully submitted this 10th day of May, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Gene C. Schaerr*
Erik Jaffe*
H. Christopher Bartolomucci*
SCHAERR | JAFFE LLP

1717 K Street NW, Suite 900
Washington, DC  20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
gschaerr@schaerr-jaffe.com
\*_Pro hac vice_ motions forthcoming

_Counsel for State Defendants_

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of State Defendants' Motion to Dismiss has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson