# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SIXTH DISTRICT OF THE
AFRICAN METHODIST
EPISCOPAL CHURCH, *et al.*,

  Plaintiffs,

v.

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity, *et
al.*,

  Defendants.

CIVIL ACTION NO. 1:21-CV-01284-
JPB

**PLAINTIFFS'
RESPONSE IN OPPOSITION TO
STATE DEFENDANTS' MOTION
TO DISMISS**

# TABLE OF CONTENTS

I.   PLAINTIFFS HAVE STANDING ...................................................................3

  A.   Plaintiffs Have Alleged An Imminent Injury In Fact ..........................3

  B.   Plaintiffs' Injuries Are Traceable To And Redressable By Defendants
       ...................................................................................................................7

II.  THE COMPLAINT STATES PLAUSIBLE CLAIMS FOR RELIEF ..............................8

  A.   Intentional Discrimination Claims (Counts I and II) ...........................8

  B.   Undue Burden (Count III) and Discriminatory Results (Count I)
       Claims ....................................................................................................11

       1.   Restrictions On Mobile Voting Units ......................................13

       2.   ID Requirements .........................................................................15

       3.   Restrictions On Drop Boxes ......................................................16

       4.   Reduced Advance Voting for Federal Runoff Elections ..........18

       5.   Prohibition On In-County Provisional Ballots ........................19

       6.   Line Relief Ban ..........................................................................20

  C.   First Amendment Claim (Count IV) ....................................................21

  D.   ADA and Section 504 Claims (Counts V and VI) .............................22

  E.   Civil Rights Act Claim (Count VII) ....................................................24

# TABLE OF AUTHORITIES

*American Iron & Steel Institute v. OSHA*,
    182 F.3d 1261 (11th Cir. 1999) ....................................................................3

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ...........................................................................*passim*

*Arcia v. Florida Secretary of State*,
    772 F.3d 1335 (11th Cir. 2014) ..................................................................4, 5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................3

*Bischoff v. Osceola County*,
    222 F.3d 874 (11th Cir. 2000) ......................................................................3

*Burdick v. Takushi*,
    504 U.S. 428 (1992) .....................................................................................11

*Burson v. Freeman*,
    504 U.S. 191 (1992) .....................................................................................21

*Clapper v. Amnesty International USA*,
    568 U.S. 398 (2013) ......................................................................................5

*Common Cause/Georgia v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) .................................................................3, 5

*Cowen v. Georgia Secretary of State*,
    960 F.3d 1339 (11th Cir. 2020) ..................................................................13

*Crawford v. Marion County Election Board*,
    553 U.S. 181 (2008) .....................................................................................16

*Democratic Executive Committee of Florida v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ..................................................................11

*Florida State Conference of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ....................................................................5

*Ford v. Strange*,
   580 F. App'x 701 (11th Cir. 2014)...........................................................................7

*Greater Birmingham Ministries v. Secretary of State of Alabama*,
   992 F.3d 1299 (11th Cir. 2021) ......................................................*passim*

*Hunt v. Cromartie*,
   526 U.S. 541 (1999)................................................................................................9

*Hunt v. Washington State Apple Advertising Commission*,
   432 U.S. 333 (1977)...........................................................................................3, 4

*Jacobson v. Florida Secretary of State*,
   974 F.3d 1236 (11th Cir. 2020) ............................................................................8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................................3

*Martin v. Crittenden*,
   347 F. Supp. 3d 1302 (N.D. Ga. 2018)................................................................25

*Meyer v. Grant*,
   486 U.S. 414 (1988)..............................................................................................21

*North Carolina State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ..............................................................................16

*People First of Alabama v. Merrill*,
   815 F. App'x 505 (11th Cir. 2020).......................................................................23

*Spain v. Brown & Williamson Tobacco Corp.*,
   363 F.3d 1183 (11th Cir. 2004) .............................................................................2

*Tsao v. Captiva MVP Restaurant Partners, LLC*,
   986 F.3d 1332 (11th Cir. 2021) .............................................................................6

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ...............................................................................12

*Village of Arlington Heights v. Metropolitan Housing Development
  Corp.*,
  429 U.S. 252 (1977)............................................................*passim*

*Warth v. Seldin*,
  422 U.S. 490 (1975)...................................................................3

*Wollschlaeger v. Governor of Florida*,
  848 F.3d 1293 (11th Cir. 2017) ...............................................4

**STATUTES**

52 U.S.C.
  § 10101.....................................................................................25


Official Code of Georgia Annotated (O.C.G.A.)
  § 21-2-30...................................................................................8
  § 21-2-31...................................................................................7
  § 21-2-33.1................................................................................8
  § 21-2-33.2................................................................................8
  § 21-2-50...................................................................................7
  § 21-2-414..........................................................................21, 22

**REGULATIONS**

28 C.F.R.
  § 35.130....................................................................................22

**INTRODUCTION**

Record numbers of voters of color participated in Georgia's most recent elections. Consistent with a centuries-long pattern, the State of Georgia responded with unjustified and unlawful restrictions on the right to vote. Senate Bill 202 ("S.B. 202") imposes numerous restrictions that, individually and cumulatively, unduly burden Georgians' right to vote and disproportionately harm historically disenfranchised groups, including voters of color and voters with disabilities. None of the State's purported contemporaneous rationales justify these burdens.

Plaintiffs—nine non-partisan, nonprofit organizations dedicated to protecting the right to vote—challenge certain provisions of S.B. 202. State Defendants ("Defendants") urge this Court to "leave the policy decisions for others." Motion to Dismiss ("Mot.") 2. But discrimination at the ballot box is not an unreviewable "policy" that the law permits. All Plaintiffs ask is for this Court to enforce the Constitution and federal law—not for any political party or partisan agenda, but for all Georgians, and particularly for disenfranchised groups.

Plaintiffs specifically ask the Court to enjoin certain of S.B. 202's provisions that (1) purposefully deny or abridge the right to vote based on race, in violation of Section 2 of the Voting Rights Act ("Section 2") and the Fourteenth and Fifteenth Amendments, (2) unduly burden the right to vote of all Georgians, in violation of

the First and Fourteenth Amendments, (3) deny voters of color an equal opportunity to participate in the political process, in violation of Section 2, and (4) discriminate against voters with disabilities, in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Plaintiffs also ask this Court to enjoin (5) the ban on providing free support to voters waiting in line ("line relief ban") because it violates the First Amendment and (6) the requirement that officials reject absentee ballots based on immaterial errors, which violates the Civil Rights Act of 1964.

The First Amended Complaint ("FAC") plausibly alleges each of these violations. Defendants attempt to disregard these allegations, claiming that Plaintiffs lack standing because their injuries are not "certainly impending," and that the FAC fails to state a claim for relief. As to the first point, S.B. 202 is the law: the burden on Georgia voters—and the actions that Plaintiffs will be forced to take in response to those burdens—are the definition of "certainly impending." As to the second, the FAC methodically supports each element of its claims with detailed factual allegations. Defendants' conclusory assertions otherwise are meritless, and their motion to dismiss should be denied.

## LEGAL STANDARD

On a motion to dismiss, the Court must "take the facts from the allegations in the complaint, assuming those allegations to be true." *Spain v. Brown & Williamson*

*Tobacco Corp.*, 363 F.3d 1183, 1186 (11th Cir. 2004).  For Rule 12(b)(1) motions, this standard applies to standing allegations.  *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000).  To prevent dismissal under Rule 12(b)(6), a plaintiff must allege facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.    Plaintiffs Have Standing

Article III standing requires (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).   If even *one* Plaintiff has standing, this Court need look no further.  *Am. Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999).

### A.    Plaintiffs Have Alleged An Imminent Injury In Fact

An organization can establish standing based on injuries to itself (i.e., organizational standing), *see Warth v. Seldin*, 422 U.S. 490, 511 (1975), or on behalf of its members (i.e., associational standing), *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Plaintiffs need only establish one or the other, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009), yet here Plaintiffs have standing under both approaches.

*First*, Plaintiffs have organizational standing. They allege, with significant factual detail, that S.B. 202's challenged provisions force them to divert resources away from existing organizational activities to assist Georgia voters who are harmed by those provisions.[1] Under binding precedent, this diversion of resources establishes organizational injury-in-fact.[2] *See, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014). *Second*, Plaintiffs have associational standing.[3] Their members are subject to the very provisions being challenged, FAC ¶¶ 31-32, 59-61, 68, 77, 83-86, the challenges are germane to the organizations' respective missions, *id.* ¶¶ 33, 59, 67, 73, 82, 85-86, and there is no need for individual member participation. *Hunt*, 432 U.S. at 343.

---

[1] *See* FAC ¶¶ 35-39 (Sixth District of the African Methodist Episcopal Church ("AME Church")); *id.* ¶¶ 87-92 (Southern Christian Leadership Conference ("SCLC")); *id.* ¶¶ 49-52 (Women Watch Afrika ("WWA")); *id.* ¶¶ 43-46 (Georgia Muslim Voter Project ("GAMVP")); *id.* ¶¶ 55-58 (Latin Community Fund Georgia ("LCF Georgia")); *id.* ¶¶ 62-66 (Delta Sigma Theta Sorority, Inc. ("the Deltas")); *id.* ¶ 69 (Georgia ADAPT) *id.* ¶¶ 75-78 (Georgia Advocacy Office ("GAO")); *id.* ¶ 84 (The Arc of the United States ("The Arc")).

[2] Plaintiffs AME Church, the Deltas, WWA, and The Arc also have standing because they have alleged that S.B. 202's line relief ban will injure them *as organizations* by restricting their ability to continue engaging in this conduct and subjecting them to potential criminal prosecution. FAC ¶¶ 33, 41-42, 47-48, 57, 64, 67, 82, 90; *see Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc).

[3] As a designated protection and advocacy organization, GAO may assert standing on behalf of constituents with disabilities. *Doe v. Stincer*, 175 F. 3d 879 (11th Cir. 1999).

Defendants do not dispute these points.  Instead, they assert that Plaintiffs' injuries are not "certainly impending" or "substantially likely to occur," but instead are "based on a highly attenuated chain of possibilities."  Mot. 5-6.  Defendants cite *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) for this proposition, but the *Clapper* plaintiffs lacked standing because their injury "rest[ed] on a speculative chain of possibilities" that required *the government* (and a court) to take a series of potential future actions.  *Id.* at 410.  That of course is not the case here: there is nothing "speculative" about S.B. 202, an already enacted law.  The Eleventh Circuit is clear that, in situations just like this, organizations have standing to challenge such laws where they will divert resources away from their core functions in order to respond to the harms caused by the challenged law.  *See, e.g., Arcia*, 772 F.3d at 1341-42 (standing where organizations with "missions that include voter registration and education, or encouraging and safeguarding voter rights" diverted resources to assist voters); *Billups*, 554 F.3d at 1350-51 (standing where organization "actively involved in voting activities" alleged it "would divert resources from its regular activities to educate and assist voters in complying with" new law); *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (standing where organization "divert[ed] personnel and time" from other activities "to educating volunteers and voters" on new voting requirement).

That is exactly what Plaintiffs allege.  The FAC includes extensive, detailed allegations regarding the steps Plaintiffs will be forced to take in response to S.B. 202.  FAC ¶¶ 32-92.  Defendants cherry-pick a single allegation—that Plaintiff AME Church anticipates having to divert resources to respond to inquiries from pastors and members about S.B. 202—to argue that any harm to AME Church is uncertain.  Mot. 7.  But AME Church, and every other Plaintiff, also allege numerous steps they *will take* in response to S.B. 202, regardless of any third party's independent action. *See, e.g.*, FAC ¶ 36 ("Not only will AME Church have to educate its members about the new ID Requirements, it will also have to help members who do not have any S.B. 202-approved ID or documentation to obtain these materials[.]"); *see also id*. ¶ 52 ("WWA will have to spend more … resources on existing training programs … which … will need to undergo substantial revisions in light of S.B. 202.").

Finally, Defendants cite *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021), for the premise that a plaintiff cannot impose an injury on itself if there is not a substantial risk of harm.  This is irrelevant here, because, again, there *is* a substantial risk of harm: S.B. 202 is the law, and its challenged provisions will burden Plaintiffs, their members, and all Georgia voters.[4]

---

[4] Defendants appear to also assert that Plaintiffs' associational injuries are speculative, Mot. 6, but they never explain how.  Nor could they, because S.B. 202

**B.      Plaintiffs' Injuries Are Traceable To And Redressable By Defendants**

Defendants devote three sentences to arguing that "many of Plaintiffs' claims should be dismissed … because they cannot establish that the alleged injuries are traceable to State Defendants." Mot. 8. But they never say which claims or which of the challenged provisions are not traceable to them. They merely say that they are not responsible for "'long lines' at polling places." *Id*. But Plaintiffs do not challenge "long lines" themselves. Instead, they challenge specific provisions of S.B. 202 that, among other results, will contribute to long lines and make those lines more difficult to endure, which will burden voters and disproportionately impact voters of color. Defendants oversee, control, and maintain responsibility for implementation of the challenged provisions. FAC ¶¶ 94-96. Plaintiffs' injuries are thus traceable to Defendants' actions, and an order prohibiting them from enforcing such provisions will redress those injuries.[5]

burdens Plaintiffs' members' right to vote, and that burden is a concrete injury as a matter of law. *Fort v. Strange*, 580 F. App'x 701, 708 (11th Cir. 2014).

[5] While some provisions are carried out by county election officials (whom Plaintiffs have also sued), Defendants have expansive statutory authority over those officials, including the authority to regulate, train, investigate, and sanction their failure to comply with Georgia and federal law, O.C.G.A. §§ 21-2-31, 21-2-50(a). S.B. 202 also gives the State Election Board, of which the Secretary of State is a member, authority to overtake, remove, and replace county election officials, S.B. 202 §§ 5,

## II.    The Complaint States Plausible Claims For Relief

Plaintiffs have adequately pleaded their claims.  Defendants ignore portions of the FAC and repeatedly make unsupported and unexplained legal conclusions.

### A.    Intentional Discrimination Claims (Counts I and II)

Plaintiffs have adequately alleged that seven components of S.B. 202, collectively and individually, intentionally discriminate against voters of color in violation of Section 2 (Count I) and the Fourteenth and Fifteenth Amendments (Count II).  *See* FAC ¶¶ 332, 334-337.  A law is unconstitutional under these provisions so long as race is a "motivating" factor in its enactment; Plaintiffs need not allege that "a particular purpose was the 'dominant' or 'primary' one."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  The *Arlington Heights* factors,[6] as supplemented by the Eleventh Circuit, guide courts in this inquiry.  *See Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d

---

6, 7; O.C.G.A. §§ 21-2-30, 21-2-33.1(f), 21-2-33.2, and thus ultimate control of whether and how the challenged provisions are implemented, *see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (removal authority is an important indicator of control).

[6] The *Arlington Heights* factors are: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators." *GBM*, 992 F.3d at 1321-23.  Courts in the Eleventh Circuit also consider: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.*

1299, 1322 (11th Cir. 2021) ("*GBM*").  Because claims of intentional discrimination are fact-specific, they are rarely decided pre-trial.  *See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).[7]

S.B. 202 is the "latest iteration" of "ongoing efforts by Georgia elected officials and legislators to curtail, severely burden, and restrict ballot access for voters of color."  FAC ¶ 4.  With S.B. 202, Georgia has once again responded to "increasing political participation" by voters of color, *id.* ¶ 20, "with unrelenting efforts to suppress" their vote, *id.* ¶ 6.  *See also id.* ¶¶ 194-219, 332, 335.   Plaintiffs support these assertions by addressing each of the *Arlington Heights* factors in detail.  *See* FAC ¶¶ 23, 275-319 (disproportionate impact on voters of color that was also known and reasonably foreseeable); *id.* ¶¶ 139-181 (Georgia's history of racially discriminatory voting practices); *id.* ¶¶ 207-218 (events leading to S.B. 202's passage, including record participation by Black voters); *id.* ¶¶ 219-245 (opaque process leading to the enactment of S.B. 202); *id.* ¶¶ 227-228 (contemporary statements of legislators); *id.* ¶¶ 223-224 (tenuousness of the stated justifications).

Rather than acknowledge these extensive factual allegations, Defendants

---

[7] *GBM* requires plaintiffs to allege both "discriminatory purpose and effect."  992 F.3d at 1321.  Plaintiffs have alleged far more "effect" than is required for a discriminatory intent claim.  *See infra*, pp. 11-21.

complain that Plaintiffs "have not sufficiently alleged" the *Arlington Heights* factors.[8]  Mot. 25; *see also id.* at 15.  They characterize the "alleged impacts" as "minimal," dismiss Georgia's record of discriminatory voting practices as "far distant," and contend that S.B. 202 "went through normal channels," *id.* at 15.  But the FAC's specific allegations disputing Defendants' characterizations must be taken as true.  And neither facially neutral statements of legislative intent nor the absence of "racially discriminatory" on-the-record statements by legislators, *id.*, inoculate S.B. 202 from scrutiny.  Because a discriminatory motive may hide behind seemingly neutral statements, courts examine whether the *Arlington Heights* factors support an "*inference* of invidious purpose."  429 U.S. at 270 (emphasis added).  Plaintiffs have adequately alleged such an inference here.

---

[8] Defendants simultaneously assert that Plaintiffs allege too little and too much, arguing the FAC is a "shotgun pleading" and should be dismissed pursuant to Rule 8 because it is too long, includes immaterial facts, and does not specify whether Defendants are responsible for each count.  This is not a serious argument.  *First*, the FAC is extensive because nine plaintiffs have challenged multiple provisions of S.B. 202, and the FAC systematically alleges the elements of each of seven complex claims.  The FAC includes four new plaintiffs and three additional claims.  *Second,* Georgia's discriminatory past is not "immaterial"; the *Arlington Heights* analysis indisputably requires courts to consider "the historical background," *GBM*, 992 F.3d at 1322, when determining if voting restrictions are intentionally discriminatory.  *See also Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (considering "the extent of any history of official discrimination" in voting).  *Third*, Plaintiffs have clearly alleged that Defendants are responsible for implementing the challenged provisions.  *See supra* pp. 7-8.

### B. Undue Burden (Count III) and Discriminatory Results (Count I) Claims

Plaintiffs have adequately alleged that the challenged provisions unduly burden Georgians' fundamental right to vote, as protected by the First and Fourteenth Amendments, *see* FAC ¶¶ 338-341 (undue burden claim, Count III), and disproportionately impact voters of color, in violation of Section 2, *see id.* ¶¶ 329-333 (Section 2 results claim, Count I).

For undue burden claims, courts "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019); *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest." *Democratic Exec. Comm.*, 915 F.3d at 1318. Even for a "slight burden," "relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318-19.

For Section 2 results claims, plaintiffs must allege that the challenged law "results in a denial or abridg[e]ment of the right to vote"—i.e., that the law deprives the affected voters of "an equal opportunity to participate in the electoral process

*and* to elect representatives of their choice." *GBM*, 992 F.3d at 1329.  In addition, plaintiffs must allege that the law "*caused* the denial or abridgement of the right to vote on account of race."  *Id.* at 1330 (emphasis in original).  The requisite causal connection can be established where a "history of discrimination"—such as "racial bias in the relevant community"—interacts with the challenged law to cause a racial inequality in opportunity to participate and elect.  *GBM*, 966 F.3d at 1330; *see also Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016) (en banc) (causation established where discriminatory "impact is a product of current or historical conditions of discrimination").

As an initial matter, Defendants repeatedly advance conclusory assertions that the challenged provisions are lawful because the State's interests justify any burden and because Plaintiffs have purportedly failed to allege causation under Section 2. Mot. 14-20, 22, 24.  But undue burden and Section 2 results claims are "peculiarly dependent upon the facts of each case" and require "an intensely local appraisal."[9] *Gingles*, 478 U.S. at 78; *Anderson*, 460 U.S. at 789; *see also Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020) (undue burden test "emphasizes the

---

[9] Because a court's analysis of these claims requires a jurisdiction- and fact-specific inquiry, *Gingles*, 478 at 78; *Anderson*, 460 U.S. at 789, Defendants cannot rely on purported factual similarities with other states' practices on a motion to dismiss, *see e.g.,* Mot. 15 n.6, 20-23, to escape judicial scrutiny.

relevance of context and specific circumstances" and is best "address[ed] with testimony and other direct evidence"). Defendants do not meaningfully attempt to explain why Plaintiffs' undue burden claims should be dismissed as a matter of law. They often do not even identify the interests purportedly advanced by the challenged provision, *see, e.g.*, Mot. 15, 17, and they never explain why their regulatory interests "make it necessary to burden the plaintiff's rights," *Anderson*, 460 U.S. at 789. Defendants likewise fail to explain why the FAC's allegations on Section 2 causation are deficient. Not only have Plaintiffs alleged that S.B. 202 was enacted with intent to discriminate against voters of color, they also allege, as detailed below, how each challenged provision was adopted for a discriminatory purpose and interacts with "racial bias" in other areas of life to disproportionately harm voters of color. *See infra*, pp. 14-21; *see* FAC ¶¶ 246-298. These allegations are more than adequate to survive a motion to dismiss.

### 1.   *Restrictions On Mobile Voting Units*

***Undue burden.*** The FAC alleges that S.B. 202 severely burdens the right to vote by drastically restricting the use of mobile voting units, FAC ¶ 248, even though such units "mitigate the shortage of accessible and secure polling locations that result[] in long lines of voters," *id.* ¶ 247, and enable "voters who would otherwise not have been able to vote, to cast their votes," *id.* ¶ 277. And there is no evidence

from the last election that mobile voting units "were not secure, caused confusion, or generated any other voter access or election administration issues."   *Id.* ¶ 248. Defendants make a variety of extraneous points: only "one county" used mobile voting units in 2020, and other aspects of S.B. 202 require "advance notice" of precinct locations.   Mot. 13-14.   These assertions do not undercut the essential allegations outlined above: S.B. 202 prevents counties across the board from deploying mobile voting units, thus harming numerous voters who rely on mobile voting units by necessity.

**Section 2.**   Contrary to Defendants' assertion, the FAC specifically alleges discriminatory impact: mobile voting units help "reduce barriers to voting that disproportionately affect voters of color," such as "long voting lines and backlogs of absentee ballot requests."   FAC ¶ 277.   As a result, "eliminating" such units "will disproportionately burden" Georgia voters of color, especially in Fulton County, a majority-minority jurisdiction that employed mobile voting units in the most recent election.[10]   *Id.*   Defendants' argument on causation also fails.   The FAC plausibly alleges that the State eliminated mobile voting units because they were

_____

[10] Defendants err in suggesting Plaintiffs rely solely on the "demographic makeup of Fulton County" to support the "disparate impact" element of their claim.   Mot. 14.   Voters of color across the state are more likely to experience long lines and thus more likely to be burdened by the mobile voting unit restrictions.

disproportionately used by voters of color during the last election. *Id.* ¶ 277. Further, voters of color are more likely to face difficulty traveling to fixed polling locations due to (1) polling place closures in minority communities, *id.* ¶¶ 172-177; (2) lack of access to a private vehicle, *id.* ¶¶ 185, 203; and (3) inadequate access to public transportation, *id.*, all of which are products of residential segregation and discrimination in employment and education.

### 2.   *ID Requirements*

***Undue burden.*** The ID requirements for requesting and casting an absentee ballot severely burden voters who lack one of the limited forms of acceptable ID and the equipment necessary to copy alternative documents.   FAC ¶ 278.[11]   These requirements are not justified by any legitimate state interest: there is no "statistically significant evidence of absentee voter fraud in Georgia," and multiple state election officials affirmed the integrity of Georgia's most recent elections.  *Id.* ¶ 285.

Defendants contend that the Supreme Court and Eleventh Circuit have held that ID requirements do not burden voters.  But neither *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), nor *GBM* granted states carte blanche to

---

[11] Defendants assert Plaintiffs "wrongly assum[e] that a photo ID is required to vote absentee."  Mot. 16.  This is puzzling, as Plaintiffs' challenge is not premised on any photo ID requirement; rather, Plaintiffs contend that S.B. 202's *numerous* ID requirements on absentee ballots impose an undue burden.  *See* FAC ¶ 255.

impose voter ID requirements, no matter how restrictive or unjustified.  Rather, those Courts engaged in case-specific analyses based on "the record that has been made in th[e] litigation." *Crawford*, 553 U.S. at 202 (undue burden); *GBM*, 992 F.3d at 1329-1330 (considering "the totality of the circumstances" and the "evidence" "[i]n this case").  Because the undue burden analysis is case-specific, pointing to other cases involving different states, statutes, and facts does not establish that Plaintiffs' allegations are inadequate as a matter of law.

*Section 2.*    Defendants do not dispute that Plaintiffs adequately allege discriminatory impact.  As to causation, the ID requirements were adopted to constrict the "unprecedented" surge in absentee voting by people of color, at rates "even higher than white voters," FAC ¶¶ 284, 286, and interact with racial bias and discrimination in other areas that render voters of color less able to satisfy the requirements and participate equally in the political process.  *See id.* ¶¶ 279, 281, 285-286.  *Cf. N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) (discussing the "remov[al] [of] voting tools that have been disproportionately used by African Americans").  These allegations satisfy Plaintiffs' pleading burden.

### 3.    *Restrictions On Drop Boxes*

*Undue burden.*  S.B. 202 strips counties of the power to place outdoor secure drop boxes that are accessible 24/7, which burdens voters with "caregiving or strict

(and/or unpredictable) work commitments that limit their availability" during normal business or voting hours by "forcing [such voters] to navigate more onerous paths to voting, if they are able to vote at all." FAC ¶ 288. Defendants claim "there is no right to vote in any particular manner," Mot. 18, but Plaintiffs do not request any specific voting method; they seek only to prevent a rule that will severely burden voters without any compelling justification. Defendants also contend "the right to vote is not implicated" if "there are multiple options from which a voter can select." Mot. 18. But whether voters in fact have "multiple options" is a factual question that cannot be resolved at this stage, especially in light of Plaintiffs' allegations to the contrary.[12]

**Section 2.** Defendants contend that the only race-related claim stems from the "in-person surveillance requirements." Mot. 19. This is incorrect. Plaintiffs allege that voters of color are more likely to "rely on drop boxes" that are accessible outside normal business hours because, due to discrimination in employment, education, lending, and other areas of life, they are more likely to have caregiving

---

[12] Defendants assert that "there is no elimination of any access" to returning absentee ballots "[g]iven the large number of locations to drop off mail." Mot. 18 n.10. Plaintiffs, however, have alleged that "widely reported and continuing failures at the United States Postal Service have raised justifiable concerns about relying on the Postal Service to cast a ballot." FAC ¶ 288. Thus, secure drop boxes are an important method of ensuring that one's ballot will be received in time to be counted.

responsibilities and inflexible work schedules. *See* FAC ¶ 288. The restrictions on drop boxes thus burden voters of color due to their race, and the threat of intimidation from in-person surveillance simply compounds the burden. *See id.* ¶ 290.

### 4. *Reduced Advance Voting For Federal Runoff Elections*

***Undue burden.*** Plaintiffs have alleged that S.B. 202 will severely burden voters by reducing early voting for federal runoff elections "from three weeks to one week," *id.* ¶ 268, and by "eliminating the guarantee of an opportunity to vote early on the weekend," *id.* ¶ 294. Defendants do not explain why this reduction is "minimally burdensome," Mot. 20; it is immaterial that *state* runoff elections—as Defendants stress—were already held on the abbreviated timeline. And Defendants fail to explain how shortening the runoff voting period will "eas[e] the burden on election officials and on electors." *Id.* Electors will have less opportunity to vote, thereby increasing pressure on election officials on the fewer remaining in-person voting days. *See* FAC ¶¶ 307-309. Regardless, the impact on election officials is a factual question that cannot be resolved on a motion to dismiss.

***Section 2.*** Defendants wrongly assert that Plaintiffs "make only a passing reference" to discriminatory impact. Mot. 20. The FAC alleges that S.B. 202 will disproportionately burden voters of color because they are more likely to rely on advance voting, and weekend voting in particular, because they "are more likely …

to be employed in jobs that do not allow scheduling flexibility." FAC ¶ 294.

### 5.   *Prohibition On In-County Provisional Ballots*

***Undue burden.***   S.B. 202 "outright *disenfranchises* eligible Georgia voters who cast ballots in the wrong precinct"—the most severe burden there is.  FAC ¶ 291.  S.B. 202's ban on in-county provisional ballots therefore must be narrowly tailored to serve a compelling interest.  Defendants contend that the ban marginally lessens the burden on election officials by absolving them of the need to process these provisional ballots, Mot. 23, but this interest is not sufficiently weighty to justify the disenfranchisement of voters who show up to the wrong precinct.  That S.B. 202 permits provisional ballots to be counted if the voter appears after 5 p.m. only reinforces that the prohibition is not narrowly tailored: the State offers no reason why a similar opportunity could not be offered for voters who appear at the wrong precinct before 5 p.m. but cannot travel to the correct precinct in time.

***Section 2.***   Defendants attempt to minimize this prohibition's discriminatory impact on voters of color by arguing that such voters may still participate if they travel to the correct precinct.  Mot. 23-24.  This sidesteps the essential inquiry under Section 2: whether this additional hurdle to the ballot box will disproportionately affect voters of color.  Defendants err further in asserting (once again, without explanation) that Plaintiffs have not alleged causation.  Mot. 24.  As Plaintiffs have

alleged, voters of color are more likely to show up at the wrong precinct due to (1) discriminatory polling place closures, FAC ¶¶ 172-177, and (2) a disproportionately high rate of "in-county moves," which is attributable in part to residential segregation and discrimination in education and employment, *id.* ¶ 292.

### 6. *Line Relief Ban*

***Undue burden.*** Defendants characterize the burden from the line relief ban as "minimal." Mot. 22. But Georgia is notorious for inordinately long lines faced by many voters, *see* FAC ¶¶ 308-309, and the line relief ban prohibits volunteers from offering essential support—food, water, or, for voters with disabilities and the elderly, a chair—that can make or break a voter's ability to endure the long lines, *id*. ¶ 296. Defendants claim an interest in protecting voters from "improper interference, political pressure, or intimidation." Mot. 21. But the legislature did not identify any evidence to suggest that such protection was needed or that the line relief ban would advance these interests. The ban is therefore not justified by a sufficiently weighty interest, much less is it narrowly tailored, as far less burdensome measures could achieve these goals. *See infra*, p. 21, n.13.

***Section 2.*** Defendants reprise their contention that "long lines" are not a "traceable" injury. Mot. 22. As noted *supra*, p. 7, Plaintiffs do not challenge "long lines"; they challenge the line relief ban because it will deter voters of color—who

disproportionately experience excessive lines—from voting.  *See* FAC ¶ 297.

### C.    First Amendment Claim (Count IV)

The line relief ban also violates the First Amendment: it is a content-based restriction on core political speech in a public forum and is therefore subject to strict scrutiny.  *Burson v. Freeman*, 504 U.S. 191, 198 (1992).  Defendants do not dispute that S.B. 202 restricts "core political speech."  Mot. 12 (citing FAC ¶ 345); *see, e.g.*, FAC ¶ 312; *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988).  Instead, they assert that a "voting location" is a "nonpublic forum," Mot. 22, and that the constitutional standard is therefore mere reasonableness, *id*. 12.  This argument mischaracterizes the scope of the ban, which prohibits providing food or drink to any elector not just inside a polling location, but within 150 feet of a polling place or within 25 feet of any voter standing in line to vote at any polling place.  O.C.G.A. § 21-2-414(a)(1), (3).  The ban thus applies to public streets and sidewalks adjacent to polling places, which are "quintessential public forums."  *Burson*, 504 U.S. at 196 & n.2.  Strict scrutiny therefore applies.  Defendants offer no defense of the line relief ban under this standard, nor can they.[13]  But even if the reasonableness standard applied, the

---

[13] Defendants contend that volunteers can still offer supports anywhere outside of 150 feet from a polling place.  However, S.B. 202 prohibits line relief within 25 feet of any voter in line.  O.C.G.A. § 21-2-414(a)(1), (3).  Further, a less restrictive means is available: prior to S.B. 202, Georgia already prohibited "solicit[ing] votes,"

line relief ban would still fail because the legislature identified no evidence to suggest that the ban advances any interests related to protecting voters from "improper interference, political pressure, or intimidation." Mot. 21.

### D.    ADA and Section 504 Claims (Counts V and VI)

The Americans With Disabilities Act ("ADA")[14] and its implementing regulations prohibit Defendants from providing qualified individuals with disabilities access to or benefits of their programs unequal to those available to others, using eligibility criteria that unnecessarily tend to screen out people with disabilities, criminalizing reasonable modifications to policies, practices and procedures, or employing methods of administration that frustrate the purpose of their programs. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(ii), (b)(3), (b)(7)-(8). The challenged provisions[15] violate these prohibitions, *see* FAC ¶¶ 358, 370, and Defendants' contrary arguments are erroneous, cursory, and unsupported.[16]

---

"distribut[ing] or display[ing] any campaign material," "solicit[ing] signatures for any petition," or "set[ting] up any tables or booths" within 150 feet of polling places or 25 feet of voters in line. O.C.G.A. § 21-2-414(a).

[14] Because ADA and Section 504 claims are generally governed by the same standards, for simplicity, this brief primarily addresses Plaintiffs' ADA claim.

[15] Other aspects of S.B. 202—such as shortening the advance voting period for runoffs—combine with the challenged provisions to burden voters with disabilities.

[16] The few cases Defendants cite are not based on ADA standards and are thus

Defendants claim that S.B. 202's ID requirements and restrictions on drop boxes, in-county ballots, and absentee ballot assistance are valid because "multiple other accessible options exist."  Mot. 17, 19, 24-25.  Defendants cite no case to support this theory—because it is not the law.  The ADA bans discrimination in all of Defendants' services, programs, or activities.  Absentee voting, drop box voting, and in-person voting are *each* distinct programs, and *each* must be accessible to disabled voters.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503-05 (4th Cir. 2016).  Even were an "accessible" alternative available, that would not suffice under the ADA.  *See, e.g.*, FAC ¶¶ 277-281, 288-289, 293, 298-301; *see also Westchester Disabled on the Move v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004) (finding availability of absentee balloting an inadequate substitute for accessible polling places).[17]

Defendants also mischaracterize or ignore Plaintiffs' arguments.  Plaintiffs do not contend that "drop boxes are required by the ADA," Mot. 19; rather, this option, if made available, must be equally accessible to people with disabilities.  Moving

---

inapposite.  *See, e.g.*, *People First of Ala. v. Sec'y of State Ala.* 815 F. App'x 505, 514 (11th Cir. 2020) (analyzing ADA claims separately from constitutional and VRA claims).

[17] Whether voters with disabilities have "multiple other accessible options," Mot. 24, which Plaintiffs contest, is a factual question that cannot be resolved on a motion to dismiss.

drop boxes indoors burdens people with disabilities, particularly mobility disabilities, compared to those without disabilities. FAC ¶ 289. Plaintiffs do in fact challenge the line relief ban under the ADA. FAC ¶¶ 298, 358. Plaintiffs do not seek "unlimited" ballot assistance for voters with disabilities, Mot. 25; they seek provision of the same opportunity to vote absentee as those without disabilities (e.g., through reasonable modifications of policies, practices, and procedures). S.B. 202 denies voters with disabilities this opportunity through its chilling effect on both those who need assistance and those who would otherwise be willing to provide it through new criminal penalties for "unlawful" assistance.[18]

### E.   Civil Rights Act Claim (Count VII)

The Civil Rights Act of 1964 prohibits election officials from denying the right to vote based on an "error or omission [that] is not material in determining"

---

[18] Defendants assert that S.B. 202's criminal penalties on assistance by certain people cannot violate the ADA because Georgia law already prohibits that assistance. But Georgia's existing prohibition violates federal law by impermissibly restricting who a voter with a disability may choose to assist them. *See* 52 U.S.C. § 10508; *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 234 (M.D.N.C. 2020); *OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 615 (5th Cir. 2017). *But see New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1302 (N.D. Ga. 2020) (denying preliminary injunction because discovery and further briefing was required). S.B. 202's criminal penalties on that protected choice eviscerates even the availability of reasonable modifications to Georgia's illegal restriction for people with disabilities.

whether an individual is qualified to vote. 52 U.S.C. § 10101(a)(2)(B). Plaintiffs allege that S.B. 202 does precisely that: S.B. 202 (1) requires voters to provide information on their absentee ballot, even though that information—most particularly their date of birth—is immaterial to voter qualifications, and (2) requires election officials to reject ballots if that information contains errors or omissions. FAC ¶¶ 372-376; *see Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) (year of birth is immaterial under Georgia law for determining voter qualification). Defendants do not contest that date of birth information is immaterial (except in the unspecified instances when two voters share a name and address), but instead argue that the claim should be dismissed because voters potentially could cure those rejected ballots. Mot. 13. Defendants cite no authority for this position, and it is inapposite: under S.B. 202, a Georgia voter will be denied the right to vote based on an immaterial error or omission, which is exactly what the statute prohibits.

## CONCLUSION

For the foregoing reasons, Plaintiffs have standing and have plausibly alleged a right to relief under each of their claims. Defendants' motion should be denied.

Respectfully submitted, this 21st day of June 2021.

/s/ *Nancy G. Abudu*
Nancy G. Abudu (Bar 001471)
*nancy.abudu@splcenter.org*
Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

/s/ *Adam S. Sieff*
Adam S. Sieff (pro hac vice)
*adamsieff@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone: (213) 633-6800
Facsimile:  (213) 633-6899

David M. Gossett (pro hac vice)
*davidgossett@dwt.com*
Courtney T. DeThomas (pro hac vice)
*courtneydethomas@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C.  20005-7048
Telephone: (202) 973-4288
Facsimile:  (202) 973-4499

Kate Kennedy (pro hac vice)
*katekennedy@dwt.com*
Matthew Jedreski (pro hac vice)
*mjedreski@dwt.com*
Grace Thompson (pro hac vice)

/s/ *Sean J. Young*
Sean J. Young (Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Theresa J. Lee (pro hac vice)
*tlee@aclu.org*
Dale E. Ho (pro hac vice)
*dho@aclu.org*
Ihaab Syed (pro hac vice)
*isyed@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.

*gracethompson@dwt.com*
Jordan Harris (pro hac vice)
*jordanharris@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

*Attorneys for Plaintiffs*
*Georgia Muslim Voter Project, Women*
*Watch Afrika, Latino Community Fund*
*Georgia, and The Arc of the United*
*States*

915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

/s/ *Leah C. Aden*
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

/s/ *Debo P. Adegbile*
Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Ilya Feldsherov (pro hac vice)
*ilya.feldsherov@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Webb Lyons (pro hac vice)
*webb.lyons@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs*
*Sixth District of the African Methodist*
*Episcopal Church, Delta Sigma Theta*
*Sorority, Georgia ADAPT, Georgia Advocacy*
*Office, and Southern Christian Leadership*
*Conference*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated:  June 21, 2021                    /s/ *Rahul Garabadu*
                                         Rahul Garabadu


                                         *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: June 21, 2021                     /s/ *Rahul Garabadu*
                                         Rahul Garabadu


                                         *Counsel for Plaintiffs*