**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH; et al., | |
| *Plaintiffs*, | No. 1:21-cv-1284-JPB |
| v. | |
| Brian KEMP, in his official capacity as Governor of the State of Georgia; et al., | |
| *Defendants*, | |
| REPUBLICAN NATIONAL COMMITTEE; et al., | |
| *Intervenor-Defendants*. | |

**INTERVENORS' BRIEF IN SUPPORT**
**OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

Introduction ............................................................................................... 1

Argument ................................................................................................... 2

    I.    Plaintiffs' constitutional right-to-vote claims fail because there is no right to vote absentee. (Count III) .......................................... 3

    II.   Plaintiffs' constitutional right-to-vote claims fail because they rely on idiosyncratic burdens on some voters. (Count III) ............. 5

    III.  Plaintiffs' section 2 and intentional-discrimination claims fail under *Brnovich*. (Counts I & II) .................................................. 10

          A.    Results-Based Discrimination ............................................. 10

          B.    Intent-Based Discrimination ............................................... 14

    IV.  Plaintiffs' facial challenge under the ADA fails. (Count V) ........ 17

    V.   The gift-giving ban does not implicate, let alone violate, the First Amendment. (Count IV) ..................................................... 18

Conclusion ............................................................................................... 21

Certificate of Compliance ...................................................................... 22

Certificate of Service .............................................................................. 22

## INTRODUCTION

The State has identified several reasons why Plaintiffs' amended complaint fails to state a claim. *See* State-Br. (Doc. 87-1) 9-25; State-Reply (Doc. 97) 4-15. Intervenors join those parts of the State's briefs.

Intervenors would add just a few points. Plaintiffs' right-to-vote claims fail because the Constitution guarantees only one method of voting and because Plaintiffs identify only idiosyncratic burdens on some voters. And especially after *Brnovich v. Democratic National Committee*, --- S. Ct. ---, 2021 WL 2690267 (U.S. July 1), Plaintiffs have not pleaded a plausible claim of racial discrimination. Plaintiffs are bringing a facial challenge, moreover, so they must plausibly allege that the challenged laws are invalid in all their applications. Because they never even try, their claims under the Americans with Disabilities Act, the First Amendment, and other laws necessarily fail.

These defects are "purely legal." *League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL 1175234, at *7 (D. Minn. Mar. 29). While voting claims "can at times be fact intensive," the notion that they cannot be dismissed at the pleading stage "is meritless." *Comm. to Impose Term Limits (etc.) v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018). And unable to muster a plausible claim of "discriminatory intent on the part of the [Georgia] legislature," Plaintiffs are not entitled to embark on "a fishing expedition" via discovery. *Wesley v. Collins*, 791 F.2d 1255, 1262-63 (6th Cir. 1986). This Court should dismiss Plaintiffs' amended complaint in its entirety.

## ARGUMENT

Nearly two weeks before Intervenors were granted intervention, Plaintiffs amended their complaint. *Compare* Doc. 83, *with* Order (June 4, 2021). The deadline to file "any required response" to the amended complaint was the later of "14 days" or "the time remaining to respond to the original pleading." Fed. R. Civ. P. 15(a)(3). Because Intervenors were not yet parties, it was unclear whether or when they could file a motion to dismiss: No response was "required" of them, and nonparties technically cannot file motions to dismiss. *See Virginia v. Ferriero*, 2021 WL 848706, at *3 n.1 (D.D.C. Mar. 5, 2021); *Vivid Ent., LLC v. Fielding*, 965 F. Supp. 2d 1113, 1122 n.1 (C.D. Cal. 2013). Intervenors thus sought this Court's guidance. *See* Doc. 93. This Court granted Intervenors leave to file a motion to dismiss earlier today.

Motions to dismiss are governed by the familiar *Twombly-Iqbal* standard. This Court must accept Plaintiffs' factual allegations as true, but not their "'legal conclusions'" or their "'naked assertions devoid of further factual enhancement.'" *Harris ex rel. Davis v. Rockdale Cty. Sch. Dist.*, 2020 WL 5639684, at *3 (N.D. Ga. Aug. 12). This Court can also consider "documents incorporated into the complaint by reference" and matters subject to "judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Based on these materials, Plaintiffs' claim must be "'plausible'"—meaning the Court has a "'reasonable expectation that discovery will reveal evidence'" supporting it. *Harris*, 2020 WL 5639684, at *3. At a minimum, the amended complaint must plausibly allege "'all the material elements'" of a "'viable legal

theory.'" *Branch Banking & Tr. Co. v. Lichty Bros. Constr.*, 488 F. App'x 430, 433 (11th Cir. 2012). Errors on a "'dispositive issue of law'" are fatal. *Id.*

Plaintiffs' claims rest on fatal errors of law. Regulations of absentee voting do not implicate the constitutional right to vote. Nor can Plaintiffs state a constitutional claim by alleging burdens that do not affect most voters. *Brnovich* also makes clear that Plaintiffs have not plausibly alleged racial discrimination under either a results-based or an intent-based theory. And their ADA and First Amendment claims have fatal legal flaws, especially since Plaintiffs are limited to bringing a facial challenge. For these reasons and more, the Court should dismiss this case.

## I.    Plaintiffs' constitutional right-to-vote claims fail because there is no right to vote absentee. (Count III)

Most of the challenged provisions of SB 202 regulate only absentee voting—either by mail or early in person. *E.g.*, Am. Compl. ¶¶22, 246-74. But for the bulk of our history, States provided nearly all voters with only one method of voting: in person on election day. *See Brnovich*, 2021 WL 2690267, at *12. SB 202 does not eliminate that option, or even make it meaningfully more difficult. Because in-person voting remains fully available, "the right to vote is not 'at stake'" here. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969)).

The Constitution guarantees *one* method of voting; "there is no constitutional right to an absentee ballot." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020). When States impose a limit on absentee voting, but not in-person voting,

3

"[i]t is … not the right to vote that is at stake … but a claimed right to receive absentee ballots"—which is not a constitutional right. *McDonald*, 394 U.S. at 807. As the Fifth Circuit has explained, the Constitution is not violated "unless … the state has 'in fact absolutely prohibited' the plaintiff from voting." *Tex. Democratic Party*, 961 F.3d at 404. And "permit[ting] the plaintiffs to vote in person" on election day, as Georgia does, "is the exact opposite of 'absolutely prohibit[ing]' them from doing so." *Id.*; *accord Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020) ("[U]nless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake.").

The Supreme Court announced this rule "unambiguously" in *McDonald*. *New Ga. Proj. v. Raffensperger*, 976 F.3d 1278, 1288 (11th Cir. 2020) (Lagoa, J., concurring). There, Illinois law allowed some classes of voters to cast absentee ballots, but not people in jail. 394 U.S. at 803-04. When inmates who couldn't post bail challenged the law, the Court unanimously held that "the right to vote" was not "at stake." *Id.* at 807. There is no "right to receive absentee ballots." *Id.* Illinois' rules on absentee voting "d[id] not themselves deny … the exercise of the franchise" because they only "ma[d]e voting *more* available to some groups." *Id.* at 807-08 (emphasis added). And Illinois' election code "as a whole" did not "deny … the exercise of the franchise" either. *Id.* Illinois had not "precluded [the inmates] from voting" because the inmates had potential options to vote in person. *Id.* at 808 & n.6. In other words, the inmates' constitutional claims failed because they were not "absolutely prohibited from voting by the State." *Id.* at 808 n.7.

When Intervenors raised this same point in *New Georgia Project*, the Eleventh Circuit agreed. *Compare* Amicus Br. of RNC & GAGOP, 2020 WL 5757920, at *4 (11th Cir. Sept. 23) ("Georgia's Election Day deadline does not implicate the right to vote at all."), *with* 976 F.3d at 1281 ("Georgia's Election Day deadline does not implicate the right to vote at all."). In that case, the Eleventh Circuit stayed a preliminary injunction against Georgia's deadline for returning mail ballots. That deadline, the Eleventh Circuit explained, "does not implicate the right to vote at all" because "Georgia has provided numerous avenues" to vote, including "in person on Election Day." 976 F.3d at 1281. So too here.

In short, the "fundamental right to vote" is "the ability to cast *a* ballot"— "not the right to do so in a voter's preferred manner." *Tully*, 977 F.3d at 613 (emphasis added). To the extent that Plaintiffs challenge SB 202's regulations of absentee voting and other nontraditional methods, their claims fail as a matter of law.

## II.   Plaintiffs' constitutional right-to-vote claims fail because they rely on idiosyncratic burdens on some voters. (Count III)

Plaintiffs' constitutional claims fail for another basic reason. Right-to-vote claims are assessed under *Anderson-Burdick*—the balancing test derived from the Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test "requires [courts] to weigh the burden imposed by the law against the state interests justifying the law." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020) (citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340,

1352 (11th Cir. 2009)). But as the Eleventh Circuit recently explained—quoting Justice Scalia's concurrence in *Crawford*—courts "'have to identify a burden before [they] can weigh it.'" *Id.* (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment)). The only burdens that Plaintiffs assert are legally "irrelevant" because they are "special burden[s] on some voters," not categorical burdens on all voters. *Crawford*, 553 U.S. at 204 (Scalia, J., concurring in the judgment) (cleaned up).

When plaintiffs challenge "generally applicable, nondiscriminatory voting regulation[s]," the burdens arising from "the peculiar circumstances of individual voters" are legally "irrelevant." *Id.* at 204-06. The *Anderson-Burdick* test is concerned only with burdens that affect voters "categorically." *Id.* at 206. This categorical approach follows from several Supreme Court precedents:

- In holding that Hawaii's ban on write-in voting "impose[d] only a limited burden on voters' rights," *Burdick* looked at the ban's effect on voters generally, rather than on the plaintiff specifically. 504 U.S. at 436-39. (Indeed, it was *the dissent* in *Burdick* that focused on the law's impact on "some individual voters." *Id.* at 448 (Kennedy, J., dissenting).)

- In rejecting voters' challenge to Oklahoma's primary election, *Clingman v. Beaver* emphasized that "Oklahoma's semiclosed primary system does not severely burden the associational rights of the state's citizenry" generally—irrespective of its specific effect on the individual plaintiffs. 544 U.S. 581, 593 (2005).

- *Storer v. Brown* likewise held that the "sever[ity]" of California's ballot-access requirements must be assessed based on "the nature, extent, and *likely* impact" of those requirements—not the known impact on the specific candidates who were plaintiffs. 415 U.S. 724, 738 (1974) (emphasis added).

*See also Crawford*, 553 U.S. at 206-07 (Scalia, J., concurring in the judgment) (analyzing other precedents).

The categorical approach makes good sense. Given inevitable differences in voters' circumstances, every voting requirement "affects different voters differently." *Id.* at 205. But those different effects are not different "burdens" imposed by a generally applicable law; they "are no more than the different *impacts* of the single burden that the law uniformly imposes on all voters." *Id.* The Constitution does not prohibit mere disparate impacts. *Id.* at 207 (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976)). Holding otherwise would imply that every voting requirement in every State is subject to invalidation whenever any voter's personal, idiosyncratic circumstances make that requirement particularly difficult. The Constitution does not tell courts to inject case-by-case hardship waivers into every election law. It entrusts state legislatures with making these policy decisions. *See* U.S. Const., art. I, §4; art. II, §1; amend. X. This constitutional design militates against the "sort of detailed judicial supervision" that a "voter-by-voter examination of the burdens of voting regulations" would require. *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment); *accord Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020).

Though Justice Scalia was writing only for himself and two others in *Crawford*, his concurrence accurately describes the governing law. As he explained, the categorical approach comes from several Supreme Court precedents—all good law, all binding. *See Crawford*, 553 U.S. at 206-07 (Scalia, J., concurring in the judgment). The lead opinion in *Crawford*, moreover, "neither

reject[ed] nor embrace[d]" the categorical approach. *Id.* at 208. It didn't need to because the plaintiff there failed to "provide any concrete evidence of the burden" that the law imposed "on any class of voters." *Id.* at 201-02 (op. of Stevens, J.). Several lower courts have thus followed Justice Scalia's concurrence as an accurate statement of the law. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 663 (6th Cir. 2016) (Keith, J., concurring in part, dissenting in part) ("The Majority relies in part on Justice Scalia's concurrence in *Crawford*"). The Eleventh Circuit has also relied on it. *See, e.g.*, *Jacobson*, 974 F.3d at 1261; *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1327 (11th Cir. 2021).

The correct, categorical approach to *Anderson-Burdick* is fatal to Plaintiffs' claims. While Plaintiffs make passing allegations of SB 202's burdens on "all voters," Am. Compl. ¶¶23, 27, 276, 278, they fail to allege in "non-conclusory" terms that SB 202 imposes meaningful burdens on "voters generally," *League of Women Voters of Minn.*, 2021 WL 1175234, at *9. Plaintiffs focus entirely on the "discriminatory" burdens allegedly imposed on certain subclasses of voters. *E.g.*, Am. Compl. ¶¶275-328. This "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Ne. Ohio Coal.*, 837 F.3d at 631. The better view is that it's prohibited.

Plaintiffs' noncategorical approach is *certainly* prohibited with respect to facial challenges. As *Crawford*'s lead opinion explains, a facial challenge "must

fail where the statute has a 'plainly legitimate sweep,'" so courts must focus on an election law's "broad application to all … voters." 553 U.S. at 202-03 (op. of Stevens, J.). That an election law imposes "an unjustified burden on some voters," the lead opinion reiterated, cannot "invalidate the entire statute." *Id.* at 203; *accord id.* at 198-200 (evaluating the burden on "most voters" and explaining that an unjustified burden on "a few voters" is "by no means sufficient"). As a court recently explained in another case involving Intervenors, a plaintiff cannot maintain a facial challenge "based only on burdens tied to the peculiar circumstances of individual voters." *League of Women Voters of Minn.*, 2021 WL 1175234, at *8.

Yet Plaintiffs challenge SB 202 on its face. They ask this Court to enjoin Defendants from giving "any effect" to the challenged provisions. Am. Compl. 132. They do not ask for as-applied relief for any "particular persons." *Cf. Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). Even if that kind of relief were permissible—and it isn't, *see Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment))—organizational plaintiffs like these lack standing to seek as-applied relief, *see Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 974 F.3d 408, 421-22 (3d Cir. 2020). Plaintiffs thus seek to do what the law forbids: invalidate an election law for "*all* voters" because it allegedly "imposes 'excessively burdensome requirements' on *some* voters." *Brakebill v. Jaeger*, 905 F.3d 553, 558 (8th Cir. 2018). That kind of claim "is not plausible" and should be "dismissed with prejudice." *League of Women Voters of Minn.*, 2021 WL 1175234, at *8, *12.

9

### III. Plaintiffs' section 2 and intentional-discrimination claims fail under *Brnovich*. (Counts I & II)

Less than two weeks ago—but more than a month after Plaintiffs filed their amended complaint—the Supreme Court decided *Brnovich*. A landmark decision, *Brnovich* was "the first time" that the Court applied section 2 of the Voting Rights Act to laws governing "how ballots are collected and counted." 2021 WL 2690267, at *5; *accord id.* at *10 ("this is our first foray into the area"); *id.* at *11 ("this is our first §2 time, place, or manner case"). The Court substantially clarified the law in this area, especially for section 2's so-called "results test." Under *Brnovich*'s framework, Plaintiffs do not come close to stating a claim of results-based or intent-based discrimination.

#### A. Results-Based Discrimination

Section 2 asks whether, under the "totality of circumstances," a voting procedure "results in" the denial of voting rights "on account of race or color." 52 U.S.C. §10301. The statute's "touchstone," according to *Brnovich*, is whether voting is equally open to individuals of all races. 2021 WL 2690267, at *12. That a voting regulation has a "disparate impact" on some racial group—even a "'statistically significant'" one—is not enough. *Id.* at *16. Otherwise, existing disparities in "employment, wealth, and education" would disable the States and "bring about a wholesale transfer of the authority to set voting rules … to the federal courts." *Id.*

*Brnovich* instructs courts considering section 2 claims to consider all relevant circumstances. *Id.* at *12. It mentions five "important circumstances" in particular: the size of any burden on voting, any deviation from procedures

common in 1982, the size of any racially disparate impact, the other available ways to vote, and the strength of the State's interests. *Id.* at *12-13.

While *Brnovich*'s list is nonexhaustive, the Court stated several subrules that courts "must" follow:

1.  Courts "must tolerate 'the usual burdens of voting.'" *Id.* at *12. "Mere inconvenience" never violates section 2. *Id.*

2.  When section 2 was amended in 1982, States required "nearly all voters to cast their ballots in person on election day." *Id.* This history, as well as the current laws in other States, "must be taken into account." *Id.*

3.  Courts must assess "the size" of any racial disparity by using a "meaningful comparison." *Id.* at *13. Plaintiffs cannot "artificially magnif[y]" "[w]hat are at bottom small differences" or create a "distorted picture" by "dividing one percentage by another." *Id.* at *17 (citing *Frank*, 768 F.3d at 752 n.3).

4.  Courts "must consider" the State's "entire system of voting" and the "other" ways it allows citizens to vote. *Id.*

5.  The State's interests behind the regulation "must be taken into account." *Id.* Preventing fraud, intimidation, and undue influence are strong, legitimate interests—even if the State is acting purely prophylactically. *Id.* at *13, *20.

After stating these subrules, *Brnovich* explained why other legal frameworks were "less helpful" in section 2 cases—including the so-called *Gingles* factors. *See id.* at *13-14.

Especially after *Brnovich*, Plaintiffs have not pleaded a plausible violation of section 2. Although *Brnovich* hadn't been decided when Plaintiffs drafted their amended complaint, it "must be given full retroactive effect" in this case. *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 96 (1993). It compels dismissal of Plaintiffs' claims for several reasons.

***First***, the challenged parts of SB 202 impose nothing beyond the "'usual burdens of voting.'" *Brnovich*, 2021 WL 2690267, at *12. All elections have rules: There is nothing unusual about requiring Georgians to register, present one of the several permissible forms of ID, apply for a ballot, timely request and return a ballot, find their assigned precinct, stand in line, and the like. *See id.* at *16, *18 (nothing unusual about having to "identify one's own polling place," "travel there," "mak[e] a trip to the department of motor vehicles," or make other similar trips to a mailbox, post office, drop box, or election office). Plaintiffs do not allege otherwise. They instead assume that even slight burdens must be justified by sufficient state interests. *E.g.*, Am. Compl. ¶¶248, 250-59, 264-70, 273-74. But Plaintiffs put the cart before the horse: Burdens that are "[m]ere inconvenience[s]" do not implicate section 2 in the first place. *Brnovich*, 2021 WL 2690267, at *12.

***Second***, nearly all of Plaintiffs' challenges involve regulations of mail voting and early voting. But in 1982, these methods of voting were *entirely unavailable* for "nearly all" Americans. *Id.* Compared to the "benchmark[]" of zero absentee voting, the challenged laws cannot impose a meaningful burden. *Id.* This Court should "doubt that Congress intended" section 2 to force States to adopt expansive versions of voting methods that didn't exist in 1982. *Id.* In fact, that reading would raise "grave constitutional concerns" about section 2's constitutionality. *Johnson v. Gov't of Fla.*, 405 F.3d 1214, 1231-32 (11th Cir. 2005) (en banc). Nor do Plaintiffs make allegations comparing Georgia's laws with those of other States. *Cf. Brnovich*, 2021 WL 2690267, at *16.

12

**Third**, Plaintiffs make no effort to quantify "the size" of any racially disparate impacts or "compar[e]" them in any "meaningful" sense. *Id.* at *13. Plaintiffs mostly just assert, in conclusory terms, that disparate impacts will occur. *E.g.*, Am. Compl. ¶¶22-23, 279, 282, 285, 287, 290, 297, 319, 324. When they provide numbers, they inflate them with the kind of statistical fallacies that *Brnovich* rejected. *See* 2021 WL 2690267, at *17, *13; *e.g.*, Am. Compl. ¶¶24, 275, 280-81, 284, 286, 292. Or they allege disparate impacts based on preexisting disparities in employment, wealth, and education—precisely what *Brnovich* deemed insufficient. *See* 2021 WL 2690267, at *16; *e.g.*, Am. Compl. ¶¶24, 25, 277-78, 280-81, 286, 288-89, 292, 293, 298, 301, 322, 325-28. These disparities are not Georgia's fault. *Frank*, 768 F.3d at 753. And allegations that "minorities [a]re 'generically' more likely than non-minorities to make use of" certain voting practices do not allege a disparity at all. *Brnovich*, 2021 WL 2690267, at *19 n.19.

**Fourth**, Plaintiffs focus on how each provision of SB 202 burdens a particular method of voting, without considering the State's "entire system." *Id.* at *13. Georgia makes it easy to vote. *See New Ga. Proj.*, 976 F.3d at 1281; *id.* at 1286 (Lagoa, J., concurring). With no-excuse absentee voting and a generous early-voting period, Georgia is in the top tier of all States for ease of voting. *See Nonpartisan Report Ranks Georgia Election Access in Top Tier After SB 202*, Ga. Sec'y of State, bit.ly/3AD0Adq (citing *How Easy Is It to Vote Early in Your State?*, Ctr. for Election Innovation & Rsch. (Apr. 12, 2021)). Voters who cannot vote absentee can vote early or on election day, and vice versa. Plaintiffs

do not allege that any Georgians, let alone most Georgians, are unable to use at least *one* of these options after SB 202. That allegation would be self-evidently implausible.

**Fifth**, Plaintiffs misstate "the strength of the state interests" behind the challenged laws. *Brnovich*, 2021 WL 2690267, at *13. Plaintiffs assume that Georgia cannot act to prevent voter fraud unless fraud is already widespread in the State. *E.g.*, Am. Compl. ¶¶18, 213, 221-24, 228, 285, 290. But the "risk of voter fraud [is] real," even if Georgia has "had the good fortune to avoid it"; and the "prevention of fraud" is a "strong and entirely legitimate state interest." *Crawford*, 553 U.S. at 196 (op. of Stevens, J.); *Brnovich*, 2021 WL 2690267, at *20, *13. It thus "go[es] without saying" that Georgia can "take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich*, 2021 WL 2690267, at *20. Georgia can also take prophylactic steps to improve its election procedures, restore voter confidence, and prevent intimidation and coercion. Section 2 is not preclearance by another name: Sovereign States can reform their voting laws without first getting permission from Plaintiffs or federal courts. *Luft*, 963 F.3d at 674. Plaintiffs' results-based claim under section 2 should be dismissed.

### B.    Intent-Based Discrimination

The test for discriminatory intent under section 2, the Fourteenth Amendment, and the Fifteenth Amendment is "the same." *Nipper v. Smith*, 39 F.3d 1494, 1520 (11th Cir. 1994) (en banc). While *Brnovich* did not alter that test, it made important holdings that illustrate why Plaintiffs' allegations fall

14

short. The key question, *Brnovich* explained, is whether "the legislature as a whole" acted with racist intent—not individual legislators. 2021 WL 2690267, at \*22. And "partisan motives are not the same as racial motives." *Id.* Neither are "'sincere'" beliefs, even if "'mistaken,'" about the existence of fraud or the wisdom of election reforms. *Id.* at \*21-22.

Plaintiffs have not plausibly alleged that SB 202 was enacted with racist intent. *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1915-16 (2020) (resolving a claim of intentional discrimination at the motion-to-dismiss stage). Courts are "reluctan[t] to speculate about a state legislature's intent." *Greater Birmingham Ministries*, 992 F.3d at 1324 n.37. Here, the only reliable evidence of *the legislature's* purposes are the formal legislative findings that the majority voted on and included in SB 202. According to those findings, SB 202 was enacted to "boost voter confidence"; "streamline … elections" by "promoting uniformity"; "reduce the burden on election officials"; prevent "improper interference, political pressure, or intimidation"; and make it "'hard to cheat.'" SB 202, §2, 2021 Georgia Laws Act 9.

SB 202's approved purposes are entirely legitimate. *See Brnovich*, 2021 WL 2690267, at \*21-22; *Crawford*, 553 U.S. at 192-93 (op. of Stevens, J.). And the legislature "f[ound] and declare[d]" that SB 202 would promote these purposes, exercising its "considered judgment" after considering "hours of testimony," making "significant modifications," and "applying the lessons learned from conducting an election in the 2020 pandemic." SB 202, §2. While Plaintiffs downplay the risk of voter fraud, *e.g.*, Am. Compl. ¶¶18, 213, 221-24, 228, 285,

290, the legislature could take a different view and pass prophylactic safe-guards, *Brnovich*, 2021 WL 2690267, at *13, *20.

The notion that these legislative findings are little more than racist pre-text is implausible. This Court must consider "the precise circumstances sur-rounding the passage of [SB 202]." *Greater Birmingham Ministries*, 992 F.3d at 1325. Plaintiffs "d[o] not identify [racist] statements" made by any legislator who voted for SB 202, let alone by "the entire body of the [Georgia] legislature." *DHS*, 140 S. Ct. at 1916 (cleaned up); *Greater Birmingham Ministries*, 992 F.3d at 1324-25. And stray statements from political campaigns—"remote in time and made in unrelated contexts"—"do not qualify as contemporary statements" about SB 202. *DHS*, 140 S. Ct. at 1916 (cleaned up).

Plaintiffs' allegations about Georgia's "racist history" are also too remote and cannot disempower the State from "enacting otherwise constitutional laws about voting." *Greater Birmingham Ministries*, 992 F.3d at 1325. "Things have changed in the South." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009). Neither the Constitution nor the Voting Rights Act is "de-signed to punish for the past." *Shelby Cty. v. Holder*, 570 U.S. 529, 553 (2013). In fact, Plaintiffs do not challenge large swaths of SB 202 precisely because those provisions make it *easier* to vote—hardly the handiwork of a legislature motivated by racism.

For all these reasons, Plaintiffs' intent-based claims do not cross the plausibility threshold. They should be dismissed as a matter of law.

## IV.    Plaintiffs' facial challenge under the ADA fails. (Count V)

Plaintiffs contend that various provisions of SB 202 violate Title II of the ADA. *See* Am. Compl. ¶¶349-60. But if voting is a public "service[], program[], or activity[]," then the challenged provisions cannot violate Title II unless they "exclude[]" disabled persons from voting "by reason of [their] disability." 42 U.S.C. §12132. As the word "exclude" suggests, "'mere difficulty in accessing a benefit is not, by itself, a violation of the ADA.'" *Smith v. Dunn*, 2021 WL 471187, at *8 (M.D. Ala. Feb. 9).

Plaintiffs are nonprofit corporations, not disabled persons, so they cannot bring an as-applied challenge to SB 202. *Free Speech Coal.*, 974 F.3d at 421-22. Plaintiffs instead must allege that the challenged provisions are *facially* invalid under the ADA. To win a facial challenge, Plaintiffs "'must establish that no set of circumstances exists under which the [challenged provision] would be valid.'" *Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 951 (E.D. Wis. 1998).

Plaintiffs come nowhere close to pleading a plausible facial challenge. As explained, the challenged provisions impose no more than the "'usual burdens'" of voting. *Brnovich*, 2021 WL 2690267, at *18. The complaint never alleges whether or how these usual burdens become prohibitively difficult for disabled persons. Nor could the complaint plausibly allege what it needs to for a facial challenge: that the challenged provisions make voting too difficult for *all* disabled voters, no matter their qualifying disability, access to assistance, or other life circumstances. Georgia gives voters many ways to cast a ballot, after all. It

is difficult to imagine *any* person who could, for example, place an absentee ballot in a drop box but not a mailbox, vote in person but only if *third parties* provide them food and water, or take advantage of in-person early voting yet be unable to get an ID and vote absentee. *Cf.* Am. Compl. ¶358. Plaintiffs certainly don't identify anyone. Plus, nothing in SB 202 prohibits typical accommodations for voters with disabilities, such as receiving assistance with travel to the polls, requesting help from poll workers, bringing their own food and water (or using the water provided by officials at the polling place), and the like.

Given all these possibilities, Plaintiffs have not plausibly alleged that the challenged provisions are invalid "in every instance." *Oconomowoc*, 23 F. Supp. 2d at 951. Facial challenges are "disfavored" because, when they are successful, the State "may not enforce the statute under any circumstance." *Id.* That strong medicine is not justified based on Plaintiffs' barebones allegations.

## V. The gift-giving ban does not implicate, let alone violate, the First Amendment. (Count IV)

Last, Plaintiffs contend that SB 202's ban on offering gifts to voters at the polling place violates the First Amendment rights to "speech and expression." Am. Compl. ¶343. This claim fails because giving gifts is conduct, not speech, and because Georgia's gift-giving ban satisfies the low level of scrutiny that governs nonpublic forums.

SB 202's ban on "giv[ing], offer[ing] to give, or participat[ing] in the giving" of money or gifts does not implicate the First Amendment because it regulates conduct alone. O.C.G.A. §21-2-414(a). The First Amendment does not

18

protect "conduct," even though most conduct is "'in part initiated, evidenced, or carried out by means of language.'" *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). The act of giving someone money or gifts is just that—an act. While banning that act will impose "incidental" burdens on speech, that unsurprising fact "hardly means that the law should be analyzed as one regulating … speech rather than conduct." *Id.*; *see also United States v. Williams*, 553 U.S. 285, 298 (2008) (laws regulating offers or conspiracies to engage in unlawful acts regulate conduct, not speech).

While the First Amendment does protect "expressive conduct," SB 202 regulates only the nonexpressive parts of gift-giving. Conduct does not become expressive "'whenever the person engaging in [it] intends thereby to express an idea.'" *FAIR*, 547 U.S. at 65-66. The conduct must be intended to convey a "'particularized'" message, and the particularized message must be highly likely to be "'understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Giving food and water to voters waiting in line expresses no particularized message that anyone would understand. *See Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (collecting and returning ballots is not expressive); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 391 & n.4 (5th Cir. 2013) (collecting and returning voter-registration applications is not expressive); *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 772-73 (M.D. Tenn. 2020) (distributing absentee-ballot applications is not expressive). Consider the messages that Plaintiffs subjectively think it communicates: "stay in line," "every vote is valuable," and "all people have inherent value." Am. Compl. ¶344. If

Plaintiffs want to communicate those messages to voters, nothing in SB 202 stops them. It regulates only the gift-giving itself. *See Steen*, 732 F.3d at 391.

Separately, even if the gift-giving ban implicated the First Amendment, it would satisfy the low level of scrutiny that applies in this context. The gift-giving ban applies only inside the polling place, within the 150-foot buffer zone around the polling place, and within 25 feet of any voter standing in line. O.C.G.A. §21-2-414(a). On election day, these areas are a "nonpublic forum." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886-88, 1883 (2018). Because the gift-giving ban is viewpoint neutral, the key question is whether it is "reasonable in light of the purpose served by the forum: voting." *Id.* (cleaned up).

The gift-giving ban is plainly reasonable. The legislature enacted the gift-giving ban to protect voters from "improper interference, political pressure, or intimidation while waiting in line to vote." SB 202, §2(13). These state interests are valid and strong. *Brnovich*, 2021 WL 2690267, at *13. While some gift-givers might not have impermissible goals, the State can act prophylactically. *See Burson v. Freeman*, 504 U.S. 191, 206-07 (1992) (plurality op.); *id.* at 216 (Scalia, J., concurring in the judgment). A prophylactic ban is especially appropriate given the State's experience with this conduct, *see* SB 202, §2(13), and the difficulties with detecting and undoing improper interference, *see Burson*, 504 U.S. at 206-07 (plurality op.). There's "no requirement of narrow tailoring in a nonpublic forum." *Minn. Voters All.*, 138 S. Ct. at 1888.

And again, Plaintiffs are bringing a *facial* challenge. The challenged provision obviously has permissible applications—such as offers of money, gifts

given inside the polling place, and food and water that are intended to influence voters—that doom Plaintiffs' facial claim. And because the gift-giving ban is a reasonable regulation of a nonpublic forum, a separate overbreadth analysis is not appropriate. *See Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015). This claim, too, should be dismissed.

## CONCLUSION

This Court should dismiss Plaintiffs' amended complaint with prejudice.

Respectfully submitted,

Dated: July 12, 2021      /s/ *Tyler R. Green*

| | |
|---|---|
| John E. Hall, Jr. | Tyler R. Green (*pro hac vice*) |
|   Georgia Bar No. 319090 | Cameron T. Norris (*pro hac vice*) |
| William Bradley Carver, Sr. | Steven C. Begakis (*pro hac vice*) |
|   Georgia Bar No. 115529 | CONSOVOY MCCARTHY PLLC |
| W. Dowdy White | 1600 Wilson Blvd., Ste. 700 |
|   Georgia Bar No. 320879 | Arlington, VA 22209 |
| HALL BOOTH SMITH, P.C. | (703) 243-9423 |
| 191 Peachtree St. NE, Ste. 2900 | tyler@consovoymccarthy.com |
| Atlanta, GA 30303 | cam@consovoymccarthy.com |
| (404) 954-6967 | steven@consovoymccarthy.com |

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5.1(B) because it uses 13-point Century Schoolbook.

_/s/ Tyler R. Green_

## CERTIFICATE OF SERVICE

On July 12, 2021, I e-filed this document on ECF, which will serve everyone requiring service.

_/s/ Tyler R. Green_