UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRIAN KEMP, Governor of the State of Georgia, in his official capacity, et al., <br><br> Defendants. | CIVIL ACTION NO. 1:21-cv-01284-JPB |

## **ORDER**

Before the Court are the following motions:

1. Defendants Brian Kemp, Brad Raffensperger, Rebecca Sullivan, Sara Tindall Ghazal, Matthew Mashburn and Anh Le's (collectively "State Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 87);

2. Defendants the county boards of election and registration for Fulton, DeKalb, Gwinnett, Cobb, Hall, Clayton, Richmond, Bibb, Chatham, Clarke and Columbia Counties' (collectively the "County Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 90); and

3. Defendants Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee

and Georgia Republican Party, Inc.'s (collectively "Intervenor Defendants") Motion to Dismiss (ECF No. 100).[1]

Having fully considered the papers filed therewith, the Court finds as follows:

## I.   **BACKGROUND**

Plaintiffs Sixth District of the African Methodist Episcopal Church ("AME Church"), Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund Georgia, Delta Sigma Theta Sorority, Inc., The Arc of the United States, Georgia Adapt, Georgia Advocacy Office and Southern Christian Leadership Conference (collectively "Plaintiffs") filed this action seeking injunctive and declaratory relief with respect to certain provisions of Georgia Senate Bill 202 ("SB 202").[2]  Governor Brian Kemp signed SB 202 into law on March 25, 2021, and the challenged provisions regulate election-related processes and activities ranging from absentee ballot voting to out-of-precinct in-person voting.

Plaintiffs allege that the challenged provisions violate the United States Constitution, the Voting Rights Act, the Americans with Disabilities Act, the Rehabilitation Act and/or the Civil Rights Act.  Specifically, Plaintiffs oppose the

---

[1] State Defendants, County Defendants and Intervenor Defendants are collectively referred to as "Defendants."
[2] Plaintiffs amended their Complaint on May 24, 2021.

specified regulations on the following grounds: discrimination, undue burden on the right to vote, immaterial voting requirement and abridgement of free speech and expression.

## II. **DISCUSSION**

County Defendants move to dismiss the Amended Complaint on standing grounds; Intervenor Defendants challenge Plaintiffs' claims on the merits only; and State Defendants seek dismissal both on standing grounds and on the merits.

The Court will address the standing question first. *See Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1422 (11th Cir. 1995) (stating that the Court is obligated "'to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based'" (quoting *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 759 (11th Cir. 1991))).

### A.    Standing[3]

To satisfy standing requirements under Article III of the United States

Constitution, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and
> particularized and (b) actual or imminent, not conjectural or
> hypothetical; (2) the injury is fairly traceable to the challenged action
> of the defendant; and (3) it is likely, as opposed to merely speculative,
> that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-

81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  These

requirements ensure federal courts adjudicate only actual "cases" and

"controversies."[4]  *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925

---

[3] Standing is jurisdictional, *see Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991), and a motion to dismiss for lack of standing can rest on either a facial or factual challenge to the complaint, *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).  In evaluating a facial challenge, a court considers only the allegations in the complaint and accepts them as true, whereas in a factual challenge, a court considers matters outside the pleadings, such as testimony and affidavits.  *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).  Here, the parties do not reference matters outside the Complaint with respect to their standing arguments.  Therefore, the Court will evaluate State Defendants' standing argument as a facial challenge and will limit its analysis to facts alleged in the Complaint.

[4] "Where only injunctive relief is sought, only one plaintiff with standing is required."  *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1118 (N.D. Ga. 2020) (quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)); *see also, e.g.*, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) (finding that it was not necessary to

F.3d 1205, 1210 (11th Cir. 2019).

## 1.    Injury

"'[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing [it] to divert resources to counteract those illegal acts.'"  *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)).  In *Common Cause/Georgia*, the Eleventh Circuit Court of Appeals found that the plaintiff had established an injury sufficient to challenge a Georgia voting statute because the plaintiff planned to divert resources from its regular voter registration, mobilization and education activities to a campaign to educate and assist voters in complying with the new voter photo identification requirement under the challenged statute. *See id.*  The court reasoned that this diversion constituted an adequate injury because it would cause the organization's noneconomic goals to suffer.  *See id*. at 1350-51.  Courts have found that a sufficient injury is demonstrated for standing

consider the standing of other plaintiffs where standing was established as to one plaintiff); *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior . . . , has standing.").  Therefore, the Court's analysis will focus on one plaintiff for the purpose of deciding the instant motions to dismiss.

purposes even when the diversion of resources is only "reasonably anticipate[d]." *E.g.*, *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260 (11th Cir. 2012) (alteration in original) (internal punctuation and citation omitted).

Here, the Amended Complaint alleges that SB 202 will cause AME Church to divert resources away from its core activities to initiatives that will inform voters of and help them navigate SB 202's changes to the election process. AME Church states that it "is a nonprofit religious organization" that "has always placed a strong emphasis on social justice initiatives." Am. Compl. ¶¶ 32-33, ECF No. 83. AME Church encourages civic participation by "holding 'Souls to the Polls' events to transport churchgoers to polling locations during advance voting periods, registering voters for elections, hosting 'Get Out the Vote' ("GOTV") efforts to increase voter turnout, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations." *Id.* ¶ 33.

AME Church alleges that it will be forced to divert "much-needed and limited resources" from its existing activities to initiatives, such as assisting constituents to understand and comply with SB 202's requirements; developing "new training materials and public education documents"; and helping members obtain SB 202-approved identification. *Id.* ¶¶ 34-39. AME Church also asserts

that SB 202's prohibition of food and water distribution at the polls will "result in the arrests of Black clergymen, lay leaders, and other volunteers." *Id.* ¶ 319.

Based on these allegations, which are analogous to those asserted by the organization plaintiff in *Common Cause/Georgia*, the Court finds that AME Church has alleged a diversion of resources that is sufficient to show an injury for standing purposes.[5]  *See Common Cause/Georgia*, 554 F.3d at 1350.

The Court is not persuaded by State and County Defendants' argument that AME Church lacks standing because its alleged diversion of resources is too speculative and not different in nature from its current work.  *E.g.*, State Defs.' Br. 6-7, ECF No. 87-1.  In *Common Cause/Georgia*, the court noted that one of the plaintiffs was "actively involved in voting activities" and planned to divert resources "to educate and assist voters" in complying with the challenged voting identification requirements.  554 F.3d at 1350.  In finding that standing was established there, the court focused on the ***diversion*** of resources—the shifting of resources from one activity to another—as the essence of the inquiry and did not mention, much less impose, the counterintuitive requirement that the new activities

---

[5] Notwithstanding this decision, Plaintiffs will be expected to prove at trial that they have indeed suffered an injury to be entitled to relief.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.21 (1982).

must further a different purpose within the organization.  *Id*.  And, as stated above,

a reasonably anticipated diversion of resources suffices.

Even the court in *Common Cause Indiana v. Lawson*, which County

Defendants cite in support of their position, had a "hard time imagining" why "an

organization would undertake any additional work if that work had nothing to do

with its mission."  937 F.3d 944, 955 (7th Cir. 2019).  In the end, the *Common*

*Cause Indiana* court concluded that the voting advocacy organizations had

established an injury for standing purposes by showing that they planned to expand

voter education programs, among other things, to counter the effects of the

challenged statute.[6]  *Id*.

Additionally, State and County Defendants' reliance on *Clapper v. Amnesty*

*International USA*, 568 U.S. 398 (2013), is misplaced.  The Supreme Court of the

United States in *Clapper* found that the plaintiffs lacked standing because the

future injury they identified was not certainly impending where they did not have

knowledge of the government's enforcement practices relating to the statute, and

they could not provide a credible basis for their fear of prosecution under the

---

[6] The only other case County Defendants cite in support of their argument—
*Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett County Board of*
*Registration and Elections*, 499 F. Supp. 3d 1231, 1240 (N.D. Ga. 2020)—is on
appeal to the Eleventh Circuit.

statute. *Id*. at 411.  Unlike in *Clapper*, the key standing question here is whether AME Church has demonstrated that SB 202 will cause it to divert resources away from its normal activities, not necessarily whether it faces potential prosecution under SB 202.

The opinion in *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021), which State Defendants cite as an additional reason to find that Plaintiffs lack standing in this case, similarly does not require a different result.  *Tsao* involved an "insubstantial," "non-imminent" and general threat of identity theft to an individual as a result of a data breach.  *Id.* at 1345.  That type of case is thus quite different from the instant pre-enforcement challenge to SB 202.

In any event, it is well settled that "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law."  *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (internal punctuation omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). To the contrary, "'the very purpose of the Declaratory Judgment Act'" is to address the "[t]he dilemma posed by . . . putting the challenger to the choice between abandoning his rights or risking prosecution."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967)).  Therefore, courts allow a plaintiff to bring a pre-

enforcement suit "when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger*, 848 F.3d at 1304 (internal punctuation omitted) (quoting *Driehaus*, 573 U.S. at 159). This type of injury is not considered too remote or speculative to support standing. *See id*. at 1305.

## 2.    Traceability and Redressability

It is well-settled that "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). Further, "it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (internal punctuation omitted) (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). Therefore, the court must be satisfied that a decision in the plaintiff's favor would "significantly increase the likelihood that [the plaintiff] would obtain relief that directly redresses the injury that she claims to have suffered." *Id.* (internal

punctuation and alteration omitted) (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241,

1260 n.7 (11th Cir. 2010)).

In *Luckey v. Harris*, which involved a complaint against the governor of

Georgia and certain state judges regarding the state's provision of legal services to

indigent criminal defendants, the Eleventh Circuit explained that "[a]ll that is

required [for injunctive relief against a state official] is that the official [sued] be

responsible for the challenged action."  860 F.2d 1012, 1015 (11th Cir. 1988).

Thus, "the state officer sued must, by virtue of his office, have some connection

with the unconstitutional act or conduct complained of.  Whether this connection

arises out of general law, or is specially created by the act itself, is not material so

long as it exists."  *Id*. at 1015-16 (internal punctuation, alteration and citation

omitted).  The court therefore concluded that prospective relief could be ordered

against the state officers, including the governor of Georgia, who is generally

responsible for enforcing the state's laws.  *Id*. at 1016.  The court explained:

> According to the Georgia constitution, the governor is responsible for
> law enforcement in [the] state and is charged with executing the laws
> faithfully.  The governor further has the residual power to commence
> criminal prosecutions and has the final authority to direct the Attorney
> General to "institute and prosecute" on behalf of the state.
> Defendants[, including the Governor,] are therefore appropriate
> parties against whom prospective relief could be ordered.

*Id*. (citations omitted).

Relying on this "binding precedent" from *Luckey*, the Eleventh Circuit rejected the state officers' argument in *Georgia Latino Alliance* that the plaintiffs did not have standing to sue because the state officials, including the governor of Georgia, lacked enforcement authority over the challenged statute.  691 F.3d at 1260 n.5.  The court emphasized that it was "easily satisfied" that the plaintiffs met the traceability and redressability requirements to bring a pre-enforcement, constitutional challenge against the officers, where "[e]ach injury [was] directly traceable to the passage of [the challenged statute] and would be redressed by enjoining each provision."  *Id*. at 1260.

Following this reasoning, the Court finds that the traceability and redressability requirements are satisfied in this case.  The injuries Plaintiffs allege are directly traceable to SB 202, for which County and State Defendants, including the Governor, have enforcement responsibility.

County Defendants' argument that SB 202's provisions are not traceable to them and cannot be redressed by entering an injunction against them is without merit.  Indeed, they concede that they must enforce SB 202 and do not dispute Plaintiffs' assertion that county officials are "responsible for the day-to-day operations of running elections" in their respective counties.  *E.g.*, Am. Compl. ¶ 99, ECF No. 83.

Further, County Defendants have not cited any authority that supports their argument that Plaintiffs cannot establish redressability without bringing suit against all Georgia counties. *Bush v. Gore*, 531 U.S. 98 (2000), is inapposite because that opinion did not analyze standing. Rather, the Supreme Court addressed the manual recount of paper ballots in a Florida election and the related issue of disparate treatment of voters across the state under the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 107. Those circumstances are easily distinguishable from County Defendants' redressability argument.

Regardless, to satisfy redressability requirements for standing purposes, Plaintiffs need to show only that an injunction against County Defendants would address at least some of the alleged injuries in this case. *See Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) (finding that the plaintiff had standing to sue the defendant even if only "a small part of the [total] injury [was] attributable to" the defendant). They have fulfilled that requirement.

Based on the foregoing analysis, the Court finds that the Article III standing requirements to bring this suit are satisfied by at least AME Church.

## B.      Failure to State a Claim

Having resolved the threshold standing issue, the Court now turns to State

and Intervenor Defendants' arguments that the Amended Complaint fails to state a

claim upon which relief may be granted.

In evaluating a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), a court "accept[s] the allegations in the complaint as true and constru[es]

them in the light most favorable to the plaintiff."[7]  *Traylor v. P'ship Title Co.*, 491

F. App'x 988, 989 (11th Cir. 2012).  However, "a plaintiff's obligation to provide

the grounds of his entitlement to relief requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do."  *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation and citation

omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that a

complaint does not suffice "if it tenders 'naked assertions' devoid of 'further

factual enhancement'" (alteration omitted) (quoting *Twombly*, 550 U.S. at 557)).

---

[7] A court is limited to reviewing what is alleged "'within the four corners of the complaint.'"  *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. App'x 883, 887 (11th Cir. 2016) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)).  If the court accepts matters outside the complaint, it "must convert the motion to dismiss into one for summary judgment."  *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985).

Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  "This standard does not require a party to plead facts with such particularity to establish a significant probability that the facts are true, rather, it requires a party's pleading of facts to give rise to a 'reasonable expectation that discovery will reveal evidence [supporting the claim].'"  *Burch v. Remington Arms Co.*, No. 2:13-cv-00185, 2014 WL 12543887, at *2 (N.D. Ga. May 6, 2014) (alteration in original) (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 570 (dismissing complaint because the plaintiffs did not state facts sufficient to "nudge[] their claims across the line from conceivable to plausible").

At bottom, the complaint must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and must "'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *Traylor*, 491 F. App'x at 990 (quoting *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d 1371, 1380 (11th Cir. 2010)).

The Court will now address the question of whether Plaintiffs have satisfied

their pleading burden with respect to each count of the Amended Complaint.[8]

1. **Count I (intentional discrimination and discriminatory results under § 2 of the Voting Rights Act ("VRA")); Count II (intentional discrimination under the Fourteenth and Fifteenth Amendments)[9]**

Plaintiffs allege that SB 202 violates § 2 of the VRA under either the intent

---

[8] State Defendants address the challenged provisions individually rather than in connection with the specified counts of the Amended Complaint.  This approach, however, analyzes the challenged provisions out of context and does not account for Plaintiffs' contention that the challenged provisions also ***collectively*** violate the law.  For the purpose of deciding the instant motions, the Court will evaluate each count as a whole and determine whether Plaintiffs have stated a claim as to the specific count.

[9] Complaints seeking to invalidate a voting statute on the grounds that it is discriminatory typically allege claims under § 2 of the VRA and/or the Fourteenth and Fifteenth Amendments.  *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021).  VRA § 2 claims generally constitute allegations of vote dilution (*e.g.*, challenges to election districting schemes) or vote denial (*e.g.*, challenges to time, place or manner restrictions on voting, such as absentee and in-person voting rules).  Either type of claim may be asserted as a discriminatory purpose/intent claim (*i.e.*, the statute was enacted with discriminatory intent and has a discriminatory effect) or a discriminatory results claim (*i.e.*, the statute results in the abridgment of the right to vote under the circumstances).  *See Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991).  Claims brought under the Fourteenth and Fifteenth Amendment require proof of discriminatory intent and effect (whether in the vote dilution or vote denial context).  *See Greater Birmingham*, 992 F.3d at 1328-29.  Therefore, the analysis of Fourteenth and Fifteenth Amendment discriminatory intent claims mirrors that of § 2 intent claims.  In this case, Plaintiffs make vote denial allegations, which are styled as § 2 discriminatory intent and results claims (Count I) and Fourteenth and Fifteenth Amendment discriminatory intent claims (Count II).

or results tests.[10]

### a.    Intentional Discrimination

According to the Amended Complaint, the challenged provisions of SB 202

"were adopted for the purpose of denying voters of color full and equal access to

the political process."  Am. Compl. ¶ 332, ECF No. 83.  Specifically, Plaintiffs

assert that:

(i) Georgia has a long history of "racially discriminatory voting schemes," which "necessitated federal intervention 187 times, including over 91 objections since the 1982 reauthorization of [§] 5 of the VRA";

(ii) "[b]etween October 2016 and October 2020, Georgia added nearly a quarter-million Black and Latinx voters to its voter registration rolls," while "the white share of the state's electorate declined";

(iii) voting in Georgia is "highly racially polarized" with 93% of Black voters supporting the Democratic candidate for governor in 2018 compared to 25% of white voters;

(iv) "[n]early 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters," and "[c]andidates preferred by Black voters received a higher percentage of absentee votes relative to their overall percentage of the final vote count";

---

[10] Courts generally analyze discriminatory intent or purpose claims under the framework the Supreme Court established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267-68 (1977). However, *Arlington Heights* did not involve a voting statute, so it does not track or refer to the language of § 2.  Discriminatory results claims, on the other hand, are usually analyzed under the framework the Supreme Court developed in *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).  *Gingles* involved a vote dilution claim, and the relevant analysis incorporates the text of § 2.

(v) "[i]n response to increasing Black voter participation and record election participation in recent elections, the Georgia General Assembly passed [SB] 202, only 79 days after" the 2021 runoff elections;

(vi) "[SB] 202 was rushed into . . . law with little time for the public to weigh in";

(vii) "[SB] 202 placed restrictions on many of the safe and secure options by which Black voters, voters of color, immigrant voters, poor voters, student voters, older voters, and voters with disabilities exercised their right to vote"; and

(viii) Black and Latinx Georgia residents experience poverty at nearly twice the rate of white residents, and white per capita income and median income is "significantly greater" than that of Black and Latinx households.[11]

*Id.* ¶¶ 152, 196, 202, 206, 212, 219, 244.  The bottom-line allegation of the Amended Complaint is that SB 202 will "disparately impact and discriminate against Black voters, other voters of color, voters with disabilities, and other historically disenfranchised communities" and that "voters with multiple of those identities—many of whom are Plaintiffs' members—will face compounded burdens, in scale and degree."  *Id.* ¶ 324.

State Defendants' arguments for dismissal of Plaintiffs' intentional discrimination claims largely focus on the merits of Plaintiffs' allegations.  In a nutshell, they assert that Plaintiffs have not sufficiently alleged a disparate impact

---

[11] The Court highlights only a few pertinent factual allegations from the Amended Complaint's extensive recitation.

claim because SB 202's provisions are not burdensome, given Georgia's alternate voting options.  *See generally* State Defs.' Br. 13-25, ECF No. 87-1.

Intervenor Defendants make similar arguments but also contend that the Court should focus on the legislative findings underlying SB 202, which they assert are "the only reliable evidence of *the legislature's* purposes."  Intervenor Defs.' Br. 15, ECF No. 100-1.  In their view, those findings prove that SB 202 was not enacted with discriminatory intent.  They argue that, at worst, the legislature was driven by the permissible purpose of securing partisan advantage.  *Id.*

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the Supreme Court of the United States identified a non-exhaustive list of factors that courts can use to evaluate whether government action was undertaken with discriminatory intent.[12]  429 U.S. 252, 267-68 (1977).  These include the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" in taking the action; "[t]he legislative or administrative history," including "contemporary statements by members of the decisionmaking body";

---

[12] State and Intervenor Defendants do not dispute that *Arlington Heights* governs Plaintiffs' discriminatory purpose claim.

and whether the "impact of the official action . . . bears more heavily on one race than another." *Id*.

Because the aforementioned allegations in the Amended Complaint are consistent with the *Arlington Heights* factors and otherwise bear on the issue of intentional discrimination, the Court finds that Plaintiffs have stated a plausible discriminatory purpose claim.[13]  At the motion to dismiss stage, Plaintiffs are not required to establish "a significant probability that the facts are true," *Burch*, 2014 WL 12543887, at *2, and only have to state facts sufficient to "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. They have done so here.

State and Intervenor Defendants' arguments, which attack the validity of Plaintiffs' allegations, are premature at this stage because they go to the merits of the claim and not to the question of whether Plaintiffs have asserted a plausible claim for relief.

Additionally, contrary to State and Intervenor Defendants' contentions that *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), established

---

[13] Plaintiffs bring intent claims under § 2 as well as under the Fourteenth and Fifteenth Amendments.  Since all of these claims are analyzed in the same way, the Court's conclusion that Plaintiffs have stated a plausible discriminatory intent claim applies to Plaintiffs' § 2 intent claim (Count I) as well as to their Fourteenth and Fifteenth Amendment intent claims (Count II).

certain requirements that Plaintiffs failed to meet here, the Supreme Court in that case expressly "decline[d] . . . to announce a test to govern all VRA § 2 claims" involving time, place or manner voting restrictions, *id*. at 2336. The Supreme Court explained that *Brnovich* was its "first foray" into deciding this type of claim and therefore found it "sufficient for present purposes to identify certain ***guideposts***" that led to its decision rather than to mandate a test that must be satisfied in all circumstances. *Id*. (emphasis added). Thus, while the language in *Brnovich* could portend future requirements to state or prove a § 2 time, place or manner claim, it should not be interpreted as currently setting forth pleading requirements that Plaintiffs must fulfill in this case.[14]

Likewise, while the Court acknowledges that the *Brnovich* opinion discusses the legislators' intent in passing the challenged statute, that analysis does not support State and Intervenor Defendants' position that *Brnovich* now requires plaintiffs in cases such as this one to allege that the legislature as a whole acted with discriminatory intent. The Supreme Court's discussion of intent in that case

---

[14] *Compare Guideline*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/guideline (last visited Dec. 6, 2021) ("an indication or outline of policy or conduct") *with Requirement*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/requirement (last visited Dec. 6, 2021) ("something essential to the existence or occurrence of something else"). "Guideline" and "Guidepost" are equivalent in the Merriam-Webster dictionary.

occurred in the course of its review of whether the district court's interpretation of the evidence of discrimination was "permissible" under the clearly erroneous standard of review. *Id*. at 2349. The district court found no indication that the legislature "as a whole" was motivated by race, despite evidence in the record that a video reflecting a racial appeal played a role in the legislature's actions. *Id*. at 2349-50. The Supreme Court concluded that the district court's finding was not clearly erroneous. *Id*. When viewed in context, this finding does not establish a new test to state a VRA § 2 discrimination claim, especially in light of the Supreme Court's express disavowal of doing so.

### b.    Discriminatory Results

In addition to the allegations set forth above, the Amended Complaint asserts that "[SB] 202 further violates [§] 2 of the VRA because, given the totality of the circumstances . . . , the [challenged] provisions, individually and cumulatively, will disproportionately deny voters of color an equal opportunity to participate in the political process and to elect representatives of their choice." Am. Compl. ¶ 333, ECF No. 83.

State and Intervenor Defendants make similar arguments in seeking dismissal of Plaintiffs' voting claims under the results test. Like State Defendants, Intervenor Defendants argue that the challenged provisions of SB 202 "impose

nothing beyond the usual burdens of voting"; "Plaintiffs [improperly] focus on

how each provision of SB 202 burdens a particular method of voting, without

considering the [s]tate's entire [voting] system"; and "Plaintiffs misstate the

strength of the state interests behind the challenged laws."  Intervenor Defs.' Br.

12-14, ECF No. 100-1.  Intervenor Defendants also contend that Plaintiffs have

failed to assert certain facts required by *Brnovich*, including "allegations

comparing Georgia's laws with those of other [s]tates" and "'the size' of any

racially disparate impacts."  *Id*. at 12-13.

> A violation of § 2 of the VRA
>
> is established if, based on the totality of circumstances, it is shown
> that the political processes leading to nomination or election in the
> [s]tate or political subdivision are not equally open to participation by
> members of a [protected] class . . . in that [they] have less opportunity
> than other members of the electorate to participate in the political
> process and to elect representatives of their choice.

52 U.S.C. § 10301(b).  To evaluate a results claim under § 2 of the VRA, courts

have relied on the factors that the Supreme Court identified in *Thornburg v.*

*Gingles*, 478 U.S. 30, 36-37 (1986), such as the extent of any history of

discrimination affecting the right to vote, the scope of racially polarized voting and

the degree to which discrimination hinders the class's ability to participate in the voting process.[15]

However, the Supreme Court's opinion in *Brnovich* called into question the usefulness of some of the *Gingles* factors in evaluating a vote denial claim under § 2 of the VRA.[16] *Brnovich*, 141 S. Ct. at 2340.  The Supreme Court identified other relevant factors, but, as discussed above, it was careful to define those factors as mere guideposts.  *See id*. at 2336.  These guideposts include the size and degree of the burden on voting, the size of the disparities between the protected class and other groups, the opportunities provided by a state's voting system, etc.  *See id*. at 2336, 2338-39.  Because this list is neither exhaustive nor prescriptive, *Brnovich* does not require Plaintiffs to plead any specific set of factors.

Here, Plaintiffs' allegations identified above correspond with *Gingles* factors that may be relevant in this specific circumstance and ultimately weigh upon the issue of whether the political process in Georgia is equally open to all voters.  Therefore, Plaintiffs have stated a plausible claim under § 2 of the VRA.

---

[15] Not all factors will be pertinent or essential to all claims.  *See Nipper v. Smith*, 39 F.3d 1494, 1526-27 (11th Cir. 1994).

[16] *Gingles* was a vote **dilution** case, wherein the plaintiff claimed that legislative districting plans diluted the ability of particular voters to affect the outcome of elections.  478 U.S. at 47.  A vote **denial** claim, on the other hand, concerns time, place or manner restrictions on voting, such as absentee and in-person voting rules. *See Brnovich*, 141 S. Ct. at 2334.

While State and Intervenor Defendants' arguments regarding the burden on voters, Georgia's voting system as a whole and Georgia's underlying interests in enacting SB 202 will likely be relevant to the analysis of Plaintiffs' claims at a later stage of this case, those contentions investigate the merits of the claims, and their resolution requires an inquiry into facts not alleged in the Amended Complaint.  Therefore, they are not appropriate at the motion to dismiss stage.

Further, as the Court explained above, the *Brnovich* factors are not prescriptive.  Thus, contrary to Intervenor Defendants' position, Plaintiffs are not required to allege those factors or otherwise provide detailed facts regarding them. *See id.* at 2336; Fed. R. Civ. P. 8(a)(2) (requiring a plaintiff to provide only "a short and plain statement of the claim showing that the pleader is entitled to relief").

Based on the foregoing analysis, the Court finds that Plaintiffs have stated a VRA § 2 claim under both the intent and results tests.  For this reason, the Court declines to dismiss Counts I and II of the Amended Complaint.

### 2. Count III (undue burden on the right to vote under the First and Fourteenth Amendments)

Plaintiffs allege that the "challenged provisions of S.B. 202 collectively and individually impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiffs and members of Plaintiffs'

organizations."  Am. Compl. ¶ 340, ECF No. 83.  The Amended Complaint

contains a detailed description of how SB 202's provisions, including regulations

regarding mobile voting units, the prohibition of line relief,[17] additional

requirements for absentee voting and restrictions on drop boxes and the

distribution of absentee ballots will burden the right to vote of disabled voters,

voters of color and others.  *See* Am. Compl. ¶¶ 275-328.  According to Plaintiffs,

"[n]one of the burdens imposed by the challenged provisions . . . are necessary to

achieve . . . any sufficiently weighty legitimate state interest."  *Id.* ¶ 341.

State Defendants respond that Plaintiffs have not established an actionable

burden under the *Anderson/Burdick* framework for evaluating voting rights claims

because the changes to the election process are "only minimally burdensome," and

the state's interests "more than justify the changes."  State Defs.' Br. 20, ECF No.

87-1.

Intervenor Defendants additionally argue that because "[m]ost of the

challenged provisions of SB 202 regulate only absentee voting," "the right to vote

is not at stake here."  Intervenor Defs.' Br. 3, ECF No. 100-1 (internal punctuation

omitted).  They also argue that "[t]he only burdens that Plaintiffs assert are legally

---

[17] "Line relief" refers to the provision of refreshments, such as food and drinks, to voters standing in line to vote at a polling place.  *See* Am. Compl. ¶ 22, ECF No. 83.

irrelevant because they are special burden[s] on some voters, not categorical burdens on all voters." *Id*. at 6.

In resolving an undue burden on voting claim, a court must: (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The analysis is not a "litmus-paper test" and instead requires a "'flexible'" approach. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citation omitted). If a court finds that a plaintiff's voting rights "are subjected to severe restrictions, the [respective] regulation must be narrowly drawn to advance a state interest of compelling importance. But when [the law] imposes only reasonable, nondiscriminatory restrictions . . . , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal punctuation and citation omitted).

Here, the Amended Complaint contains detailed allegations of burdens that Plaintiffs assert the challenged provisions will impose on Georgia voters. Plaintiffs also maintain that there are no legitimate state interests that would support such burdens. *Anderson* and *Burdick* do not require more from Plaintiffs at the motion to dismiss stage. And State and Intervenor Defendants' weighing of the alleged burden on voters, which relies on facts not asserted in the Amended Complaint, is not appropriate at this time.

The Court also declines, as Intervenor Defendants suggest, to forego the undue burden analysis the Supreme Court developed in *Anderson* and *Burdick* and summarily dispose of Plaintiffs' voting rights claims. The Court does not read *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 807-08 (1969), which states that there is no right to an absentee ballot, to require such an outcome. As described above, the *Anderson-Burdick* framework requires the Court to evaluate the type of burden imposed by the challenged provisions and apply the corresponding level of review. "Only after weighing [the designated] factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Anderson*, 460 U.S. at 789.

For all these reasons, the Court declines to dismiss Count III of the Amended Complaint.

### 3.   Count IV (freedom of speech under the First Amendment)

Plaintiffs allege that distributing food and drink to voters waiting in line and encouraging them to stay in line constitute core political speech and expression protected by the First Amendment.  Am. Compl. ¶¶ 344-45, ECF No. 83.  The Amended Complaint further explains that line relief is neither "electioneering" nor "partisan," and Plaintiffs offer relief to voters "regardless of how they plan to cast their ballot" and without asking or knowing for whom they plan to vote.  *Id.* ¶ 317. Accordingly, Plaintiffs contend that the SB 202 provisions prohibiting such conduct "unconstitutionally burden [their] First Amendment rights of speech and expression[] and are not supported by any sufficient, let alone compelling, government purpose."  *Id.* ¶ 348.

State Defendants counter that because a polling area is a nonpublic forum, the much lower reasonableness standard applies to any regulation of speech or expression therein.  State Defs.' Br. 21-22, ECF No. 87-1.  They conclude that under that lower standard, SB 202's restrictions pass muster because they are reasonable in light of the state's "regulatory interests."  *Id.* at 22.

Intervenor Defendants make a similar argument and additionally argue that the First Amendment is not implicated because line relief "is conduct, not speech." Intervenor Defs.' Br. 18, ECF No. 100-1.  They therefore assert that while the

challenged provision will impose an "incidental" burden on speech, the statute should not be analyzed as one regulating speech.  *Id*. at 19.

The First Amendment prohibits the enactment of laws that abridge the freedom of speech.  *See* U.S. Const. amend. I.  Therefore, governments generally "ha[ve] no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).

Regulation of speech based on the topic discussed or the idea or message expressed is presumptively unconstitutional and may be justified only if the government proves that the regulation is narrowly tailored to serve compelling state interests.  *See id*. at 165 (stating that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993))).

Taking as true Plaintiffs' allegations that SB 202 establishes what type of conduct and communication is permissible while engaging with voters who are waiting in line and construing those allegations in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that SB 202's

restrictions on line relief impinge on speech and/or expressive conduct in some way.

State Defendants do not provide support for their contention that such activities can be restricted simply because they occur near a polling place or that any voting line would presumptively occur in a nonpublic forum, where a lower standard of review would apply.  Nor do Intervenor Defendants cite any authority for the proposition that line relief *per se* cannot be considered expressive conduct under the First Amendment.  Indeed, they concede that line warming could impose some burden on speech.

In any event, answering the questions of whether line relief occurs in a nonpublic forum subject to greater restrictions; whether the associated speech or conduct is of the type protected by the First Amendment; what type of analysis should apply; and whether the state has identified interests sufficient to meet the applicable standard requires the type of substantive merits inquiry that is not appropriate on a motion to dismiss.

For all these reasons, the Court declines to dismiss Count IV of the Amended Complaint.

###### 4.   Count V (discrimination under Title II of the Americans with Disabilities Act ("ADA")) and Count VI (discrimination under Section 504 of the Rehabilitation Act)[18]

Plaintiffs allege that their members and constituents are qualified individuals with disabilities under the ADA.[19]  Am. Compl. ¶ 351, ECF No. 83.  They further allege that SB 202 imposes burdens on disabled voters' opportunity to vote absentee by mail, including by "adding burdensome identification requirements"; imposing criminal penalties on certain groups of people "who provide even the most basic of assistance to individuals with disabilities in returning an absentee ballot"; and "disenfranchis[ing] disabled voters who go to the wrong precinct within the right county[] and who do not have the resources (physical or financial) to travel to the correct precinct."  *Id*. ¶ 358.  Plaintiffs also contend that "[b]y limiting the locations, number, and accessibility of the drop box program, [SB] 202 essentially makes the program unavailable to many disabled voters."  *Id*.

The Amended Complaint provides specific examples of ways in which Plaintiffs assert the challenged provisions of SB 202 "will screen out or tend to screen out people with disabilities from voting and/or will defeat or substantially

---

[18] Since the ADA and Rehabilitation Act claims are governed by the same legal standard, the Court's analysis of the ADA claim applies to the Rehabilitation Act claim.  *See Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492 (11th Cir. 2020).
[19] Defendants do not dispute this point.

impair" the ability of eligible disabled voters to cast their ballots.  *Id.* ¶ 323; *see also, e.g.*, *id.* ¶¶ 320-28.  Plaintiffs conclude that because SB 202 includes "no systemic provisions to provide reasonable modifications to individuals with disabilities," it "discriminates against qualified Georgia voters with disabilities who wish to participate in the electoral process" and denies "them a full and equal opportunity to participate in the [s]tate's voting programs."  *Id.* ¶ 360.

State Defendants' key argument in support of dismissal of this claim is that "disabled voters have multiple options to vote."  State Defs.' Br. 16-17, ECF No. 87-1; *see also, e.g.*, *id.* at 17 ("Plaintiffs have not sufficiently alleged a claim for discrimination under the ADA or Rehabilitation Act because disabled voters still have multiple accessible options to participate.").  Intervenor Defendants similarly argue that "Georgia gives voters many ways to cast a ballot" and add that Plaintiffs cannot plead a plausible facial challenge to the ADA under these circumstances because they cannot show that the challenged provisions are invalid in every instance.  Intervenor Defs.' Br. 17-18, ECF No. 100-1.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The

implementing regulations for this section of the ADA further specify that "[a]

public entity shall operate each service, program, or activity so that the service,

program, or activity, when viewed in its entirety, is readily accessible to and usable

by individuals with disabilities."  28 C.F.R. § 35.150.  Thus, to state a claim under

the ADA, a plaintiff must establish

> "(1) that he is a qualified individual with a disability; (2) that he was
> either excluded from participation in or denied the benefits of a public
> entity's services, programs, or activities, or was otherwise
> discriminated against by the public entity; and (3) that the exclusion,
> denial of benefit, or discrimination was by reason of the plaintiff's
> disability."

*Silberman v. Mia. Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (quoting

*Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).

"A violation of Title II, however, does not occur only when a disabled

person is completely prevented from enjoying a service, program, or activity."

*Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001).  Rather, a plaintiff states a

claim under the ADA when the complaint alleges facts indicating that certain

"services, programs, and activities" are not "readily accessible" by reason of a

disability.  *Id.*; *see also People First v. Merrill*, 467 F. Supp. 3d 1179, 1216 (N.D.

Ala. 2020), *appeal dismissed*, No. 20-12184-GG, 2020 WL 5543717 (11th Cir.

July 17, 2020) (stating that "exclusions under Title II need not be absolute").

34

In *Shotz*, the Eleventh Circuit found that the plaintiffs sufficiently stated a claim under the ADA where they alleged that trials in the courthouse were not "readily accessible" to them, given the courthouse's steep wheelchair ramps and unfit bathrooms.  256 F.3d at 1080.  It did not matter to the court that the plaintiffs were able to attend trial, despite these obstacles.  *Id.*  The important point was that the courthouse was not ***readily*** accessible to the plaintiffs.  *Id*.

Here, the Amended Complaint contains allegations that the challenged provisions of SB 202 make it harder for disabled voters to cast their vote.  Central to the claim is the contention that the new absentee voting procedures impose burdens that disproportionately harm disabled voters and prevent them from participating fully and equally in the voting process.  Even if, as Intervenor Defendants suggest, the Court were to consider SB 202's absentee voting provisions in the context of Georgia's voting system as a whole, the facts necessary to evaluate what accommodations the state provides for disabled voters and the scope and reasonableness of such accommodations are not alleged in the Amended Complaint.  Therefore, those facts cannot be considered on a motion to dismiss.  Ultimately, the Court is left with only allegations of restricted access, which it must take as true at this stage, and which are sufficient to state a claim under the ADA.

Contrary to Intervenor Defendants' position, Plaintiffs need not show that the voting access allegedly denied here is absolute.  Both the text of the ADA and cases interpreting it are clear that a partial denial of access could be actionable.

The Court is also not currently convinced by Intervenor Defendants' argument that Plaintiffs' ADA claim should be construed as a constitutional preemption claim.  Intervenor Defs.' Reply Br. 9, ECF No. 103.  Plaintiffs point out (and the Amended Complaint reflects) that their claim for disability discrimination is expressly alleged under the ADA and not under the Constitution. The Court will thus evaluate the allegations against the ADA standard for now, and, as set forth above, Plaintiffs have met those requirements.

For all these reasons, the Court declines to dismiss Counts V and VI of the Amended Complaint.

### 5. Count VII (immaterial voting requirement under 52 U.S.C. § 10101(a)(2)(B))

Plaintiffs allege that the provisions of SB 202 requiring voters to provide their date of birth with their absentee ballot applications and their voted absentee ballots violate 52 U.S.C. § 10101(a)(2)(B) because they require election officials to "reject [an] absentee ballot solely because the date of birth on the absentee ballot does not match the date of birth in the voter's voter registration records."  Am. Compl. ¶ 375, ECF No. 83.

State Defendants respond that the date of birth requirement does not violate § 10101(a)(2)(B) because the provision requires notice to the voter of an error and an opportunity to cure the defect before the absentee ballot can be rejected.  *See* State Defs.' Br. 13, ECF No. 87-1.  Intervenor Defendants do not address this count of the Amended Complaint.

Under § 10101(a)(2)(B),

[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under [s]tate law to vote in such election.

Plaintiffs have alleged that date of birth information is not necessary to determine whether a person is qualified to vote, yet SB 202 requires county officials to reject absentee ballot applications and voted ballots of voters who make errors in providing such information.  As such, the Court finds that Plaintiffs have stated a plausible claim for relief under § 10101(a)(2)(B).

State Defendants have not provided any support for their argument that the opportunity to cure an error rehabilitates any potential violation of § 10101(a)(2)(B), and the statute is silent on this point.  This argument would also require the Court to incorrectly address the merits of Plaintiffs' allegations at the motion to dismiss stage.

For these reasons, the Court declines to dismiss Count VII of the Amended Complaint.

### III.   <u>CONCLUSION</u>

Based on the foregoing analysis, the Court **DENIES** Defendants' motions to dismiss (ECF Nos. 87, 90, 100).[20]

**SO ORDERED** this 9th day of December, 2021.

J. P. BOULEE
United States District Judge

---

[20] The Court declines to dismiss the Amended Complaint on shotgun pleading grounds.  While it is true that the Amended Complaint contains some of the hallmarks of a shotgun pleading, including verbosity and adopting the allegations of preceding counts, dismissal is appropriate "where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1325 (11th Cir. 2015) (citation omitted).  Defendants' robust response to the Amended Complaint indicates that is not the case here.