**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, <br><br> *Plaintiffs*, <br> v. <br><br> BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, <br><br> *Defendants*, <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01284-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> *Plaintiffs*, <br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Secretary of State for the State of Georgia, *et al.*, <br><br> *Defendants*, <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01259-JPB |

**<u>AME & GEORGIA NAACP PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................2

    A.    Georgians, And Especially Non-White Voters, Must Endure Long Lines At Polling Places To Exercise Their Right To Vote .........2

    B.    Plaintiffs Communicate Their Core Political Values By Providing Encouragement, Food, And Water To Voters.....................4

    C.    SB 202 Targets And Punishes Plaintiffs' Political Expression ...........8

ARGUMENT ...................................................................................10

I.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claim...............11

    A.    SB 202's Line Relief Ban Criminalizes Speech And Expressive Conduct That Is Protected Under The First Amendment ..................11

    B.    SB 202's Line Relief Ban Is Subject To Heightened First Amendment Scrutiny, Which It Cannot Survive ...............................14

        1.    Strict Scrutiny Applies Because The Line Relief Ban Is A Content-Based Restriction Of Speech In A Public Forum .......14

        2.    Alternatively, The Line Relief Ban Requires Exacting Scrutiny Because It Burdens Election-Related Expression. ...............................................................18

        3.    At a Minimum, The Line Relief Ban Is Subject To Intermediate Scrutiny.................................................20

    C.    The Line Relief Ban Cannot Survive First Amendment Scrutiny Under Any Potentially Applicable Standard.......................................21

II.    The Remaining Factors Weigh Heavily In Plaintiffs' Favor ......................26

    A.    The Deprivation Of First Amendment Freedoms Is A Quintessential Irreparable Harm .......................................................26

    B.    The Balance Of Hardships Tips Strongly In Plaintiffs' Favor ..........27

    C.    A Preliminary Injunction Is In The Public Interest............................28

III.    The *Purcell* Principle Does Not Apply And In Any Event Does Not Preclude The Limited Relief Sought Here ....................................................29

CONCLUSION .................................................................................33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Civil Liberties Union of Florida, Inc. v. Lee*,
546 F. Supp. 3d 1096 (N.D. Fla. 2021) ........................................................19

*Americans for Prosperity Foundation v. Bonta*,
141 S. Ct. 2373 (2021)...................................................................................21

*Ashcroft v. American Civil Liberties Union*,
542 U.S. 656 (2004).......................................................................................21

*Boos v. Barry*,
485 U.S. 312 (1988)................................................................................14, 16

*Brooks v. State Board of Elections*,
848 F. Supp. 1548 (S.D. Ga. 1994) ................................................................5

*Brown v. Louisiana*,
383 U.S. 131 (1966).......................................................................................12

*Buckley v. American Constitutional Law Foundation, Inc.*,
525 U.S. 182 (1999)................................................................................18, 19

*Buckley v. Valeo*,
424 U.S. 1 (1976)...........................................................................................20

*Burson v. Freeman*,
504 U.S. 191 (1992)..............................................................15, 16, 17, 23, 25

*Calzone v. Summers*,
942 F.3d 415 (8th Cir. 2019) ........................................................................19

*CBS Broadcasting, Inc. v. Cobb*,
470 F. Supp. 2d 1365 (S.D. Fla. 2006).........................................................17

*CBS Inc. v. Smith*,
681 F. Supp. 794 (S.D. Fla. 1988) ...............................................................17

*Charles H. Wesley Education Foundation, Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) ....................................................................28

*Citizens for Police Accountability Political Committee v. Browning*,
    572 F.3d 1213 (11th Cir. 2009) ............................................................17, 23

*City of Austin, Texas v. Reagan National Advertising of Austin, LLC*,
    142 S. Ct. 1464 (2022)...........................................................................14, 15

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984).....................................................................................22

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................................26, 27

*Federal Election Committee v. Ted Cruz for Senate*,
    ---S. Ct.---, 2022 WL 1528348 (U.S. May 16, 2022)...................................26

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ..............................................................27, 28

*Florida Committee for Liability Reform v. McMillan*,
    682 F. Supp. 1536 (M.D. Fla. 1988) ...........................................................17

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    11 F.4th 1266 (11th Cir. 2021) ..........................................................20, 23, 25

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018) .........................................................12, 13, 14

*Georgia Alliance for Human Rights v. Deal*,
    793 F. Supp. 2d 1317 (N.D. Ga. 2011).........................................................30

*Georgia Latino v. Governor of Georgia*,
    691 F.3d 1250 (11th Cir. 2012) ...................................................................30

*Georgia State Conference of the NAACP v. Fayette County Board of
    Commissioners*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015)..............................28

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004) ............................................................11, 13

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010).....................................................................................21

*Keeton v. Anderson-Wiley,*
    664 F.3d 865 (11th Cir. 2011) ...................................................................10

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) ...................................................................28

*League of Women Voters of Florida, Inc. v. Florida Secretary of State,*
    --- F.4th ---, 2022 WL 1435597 (11th Cir. May 6, 2022) ...........29, 30, 31, 32

*League of Women Voters of Florida, Inc. v. Lee,*
    --- F. Supp. 3d ---, 2022 WL 969538 (N.D. Fla. Mar. 31, 2022) .................32

*League of Women Voters of Florida v. Cobb,*
    447 F. Supp. 2d 1314 (S.D. Fla. 2006) .........................................................12

*League of Women Voters of Tennessee v. Hargett,*
    400 F. Supp. 3d 706 (M.D. Tenn. 2019) ................................................12, 19

*Marin v. Town of Southeast,*
    136 F. Supp. 3d 548 (S.D.N.Y. 2015) ...........................................................19

*McCullen v. Coakley,*
    573 U.S. 464 (2014)............................................................17, 21, 24, 27

*McCutcheon v. FEC,*
    572 U.S. 185 (2014)..........................................................................19, 20

*McIntyre v. Ohio Elections Commission,*
    514 U.S. 334 (1995)....................................................................18, 19, 21

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022)..........................................................................29, 32

*Meyer v. Grant,*
    486 U.S. 414 (1988)....................................................................18, 19, 20

*Minnesota Voters Alliance v. Mansky,*
    138 S. Ct. 1876 (2018)...................................................................................17

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ...................................................................28

*Perry Education Association v. Perry Local Educators' Association*,
460 U.S. 37 (1983) ...........................................................................14

*Police Department of Chicago v. Mosley*,
408 U.S. 92 (1972) ...........................................................................14

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......................................................................29, 31

*Reed v. Town of Gilbert*,
576 U. S. 155 (2015) ...................................................................14, 15

*Republican National Committee v. Democratic National Committee*,
140 S. Ct. 1205 (2020) ......................................................................29

*Texans for Free Enterprise v. Texas Ethics Commission*,
732 F.3d 535 (5th Cir. 2013) .............................................................28

*Texas v. Johnson*,
491 U.S. 397 (1989) ..........................................................................11

*United States v. Georgia*,
892 F. Supp. 2d 1367 (N.D. Ga. 2018) ..............................................28

*United States v. Gilbert*,
920 F.2d 878 (11th Cir. 1991) ...........................................................14

*United States v. O'Brien*,
391 U.S. 367 (1968) ..........................................................................20

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ......................................................14, 22, 24, 25

*Winter v. National Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ..............................................................................26

*Wisconsin Legislature. v. Wisconsin Elections Commission*,
142 S. Ct. 1245 (2022) ......................................................................29

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) .......................................................................1, 19

## STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 597 ............................................................................................10

Fla. Stat. Ann. 102.031(4)(a), (b) ................................................................25

Mont. Code Ann. § 13-35-211 .....................................................................25

N.Y. Elec. Law § 17-140 .............................................................................25

O.C.G.A. § 21-2-414 ..............................................................................*passim*

O.C.G.A. § 21-2-566 ....................................................................................24

O.C.G.A. § 21-2-567 ....................................................................................24

O.C.G.A. § 21-2-570 ........................................................................10, 15, 24

## CONSTITUTIONAL AUTHORITIES

U.S. Const. amend. I ...............................................................................*passim*

## OTHER AUTHORITIES

*Black Liberation Movements*, STORYMAPS (Dec. 1, 2020),
    https://storymaps.arcgis.com/stories/99b1e7ae89fe44e38cf9c68
    308edae83 .................................................................................................5

DuBose, *Feeding the Revolution: Food in Black Liberation
    Movements*, STORYMAPS (Dec. 1, 2020),
    https://storymaps.arcgis.com/stories/99b1e7ae89fe44e38cf9c68
    308edae83 .................................................................................................5

Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For
    Hours? Too Few Polling Places*, NPR (Oct. 17, 2020),
    https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-
    georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-
    pl .............................................................................................................13

Ganaway, *Black Communities Have Always Used Food as Protest*,
    FOOD & WINE (June 4, 2020),
    https://www.foodandwine.com/news/black-communities-food-
    as-protest .................................................................................................5

Gardner, Lee & Boburg, *Voting Debacle in Georgia Came After Months of Warnings Went Unaddressed*, WASH. POST (June 10, 2020) ............................................................................................. 13

Georgia General Assembly, SB 202, https://www.legis.ga.gov/legislation/59827 .................................................. 31

Jackson, *Black Women and the Legacy of Food and Protest* (July 10, 2020), https://www.eater.com/2020/7/10/21308260/black-women-and-the-legacy-of-food-and-protest-history; ..................................... 5

*Meeting Before the H. Comm. on Gov. Affairs*, 2020 Leg., 155th Sess. (Ga. 2020) (statement of General Counsel for the Secretary of State) ........................................................................................... 10

*Meeting Before the S. Comm. on Ethics*, 2021 Leg., 156th Sess. (Ga. 2021) (statement of Senator Sally Harrell) .................................................. 10

# INTRODUCTION

Georgia voters consistently face some of the longest wait times in the country. That is especially true for voters of color, and for Black voters in particular.  In response to these long lines, Plaintiffs have for years communicated their support and gratitude for Georgians waiting to vote by providing them with food, water, and other items of minimal pecuniary value such as hand warmers and, more recently, face coverings and hand sanitizer.  By proactively approaching voters to offer concrete, non-partisan line relief, Plaintiffs communicate a core First Amendment message: that citizens in these communities have equal dignity, their voice matters, and they should exercise their hard-earned right to vote because it is "preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  That message carries special significance for Plaintiffs, whose missions and histories focus on affirming the dignity of Black voters, voters of color, and voters with disabilities.  Those who view and receive Plaintiffs' line relief efforts understand them for what they are: a civic expression of unconditional support, gratitude, and shared strength.

Senate Bill 202 makes expressing that essential message a crime, barring the provision of any items of value anywhere within 150 feet of a polling place and within 25 feet of any voter in line no matter the distance from the polling place.  SB 202 contemplates no exception for non-partisan groups providing food and water. To the contrary, it targets those very groups by specifically itemizing food and water

as forbidden items.  This content-based sanction of fundamental electoral expression in public forums is wholly unjustified and violates the First Amendment.

Criminalizing this core political expression does not further any substantial government interest, much less meaningfully so.  And it certainly is not narrowly tailored to or the least restrictive means of advancing such an interest.  Existing federal and Georgia laws already prohibit voter intimidation, vote buying, and improper electioneering.  There is no evidence that banning the unconditional offer of pretzels or bottled water to a queuing voter furthers those goals at all, and there is significant evidence that this vastly overinclusive ban stifles far more expression than is necessary.  SB 202 thus serves only to punish speakers and silence messages the State dislikes.  It must be enjoined.

## BACKGROUND

### A.    Georgians, And Especially Non-White Voters, Must Endure Long Lines At Polling Places To Exercise Their Right To Vote

Georgia voters consistently face some of the longest lines in the country.  *See* Decl. of Sophia Lin Lakin dated May 24, 2022 (Lakin Decl.) Ex. 19 at 1 (Expert Report of Dr. Stephen Pettigrew).  During the November 2020 General Election, more than 900,000 Georgia voters, or 24.6% of all in-person voters, waited longer than the federally recommended 30-minute maximum time to cast a ballot.  *Id.* at 5. Over the last four presidential elections, over 1.3 million Georgians waited over one hour.  *Id.* at 24.  Georgia regularly has the fourth-longest lines for presidential

elections and second-longest for midterm elections. *Id.* at 9 & Fig. 3.5. Georgia stands out even among other outlier states because its voters face longer-than-average lines whether they vote early or on Election Day. *Id.* at 9-11.

Voters of color bear the brunt of these burdens. In every Georgia election for which data exists, non-white voters have faced substantially longer average wait times than white voters. *Id.* at 13-14 & Fig. 3.7. These disparities exist even when controlling for other factors, such as whether a voter lives in a rural or urban area. *Id.* at 15-19. Even within the same counties, people of color are more likely to wait longer than white voters. All told, Georgia voters of color are six times more likely than white voters to wait longer than one hour to vote. *Id.* at 15.

Georgians wait in these lines outside, along sidewalks, streets, and other public spaces that extend far beyond standard electioneering buffer zones.[1] These spaces often lack shade, places to sit, or protection from the elements. Lakin Decl. Ex. 1 ¶ 18 (Decl. of Melody Bray dated May 9, 2022 (Bray Decl.)). For example, the line wrapped around the block at the C.T. Martin Natatorium in Fulton County during the June 2020 primary elections. *Id.* ¶ 17. Voters stood for hours to cast a ballot that day. *Id.* ¶¶ 7, 12. At an early voting location in Fulton County during the

---

[1] *See* Lakin Decl. Ex. 13 ¶ 10 (Decl. of Tayleece Paul dated May 12, 2022 (Paul Decl.)); Ex. 7 ¶ 11 (Decl. of James Gaymon dated May 8, 2022 (Gaymon Decl.)); Ex. 4 ¶ 6 (Decl. of Tonia Clarke dated May 19, 2022 (Clarke Decl.)); Ex. 15 ¶ 5 (Decl. of Janie Robinson dated May 11, 2022 (Robinson Decl.)).

June 2020 primary, some voters waited approximately eight hours, finally able to cast their ballots at about 2:45 AM.  Lakin Decl. Ex. 1 ¶ 4 (Decl. of Hansel Enriquez dated May 10, 2022).  At the Cochran Public Library in Henry County during the January 2021 elections, the cold turned one voter's hands purple, while another struggled to stand until a volunteer provided her a chair.  Paul Decl. ¶ 10.

### B.  Plaintiffs Communicate Their Core Political Values By Providing Encouragement, Food, And Water To Voters

Plaintiffs in this case are religious and humanitarian organizations committed to the equal dignity of every person, as expressed through every citizen's right to vote.[2]  Black Georgians' struggle to realize their full membership in the political community informs many Plaintiffs' organizational focus on voting.  The Deltas' first public act was participation in the 1913 Suffragist March under the Delta Sigma Theta banner, insisting that Black women be represented at that historic event.  Briggins Decl. ¶ 6.  Civil rights leaders organized the march from Selma to Montgomery in an AME church, began the march on its steps, and wounded

---

[2] *See* Lakin Decl. Ex. 2 ¶¶ 5-8 (Decl. of Rhonda Briggins dated May 9, 2022 (Briggins Decl.)); Ex. 5 ¶¶ 4-5 (Decl. of Preye Cobham dated May 11, 2022 (Cobham Decl.)); Gaymon Decl. ¶¶ 7-9; Ex. 8 ¶¶ 7-9 (Decl. of Reginald T. Jackson (Jackson Decl.)); Ex. 9 ¶¶ 7, 10 (Decl. of Shafina Khabani dated May 20, 2022 (Khabani Decl.)); Ex. 10 ¶ 6 (Decl. of Glory Kilanko dated May 12, 2022 (Kilanko Decl.)); Ex. 14 ¶ 4 (Decl. of Stacey Ramirez dated May 11, 2022 (Ramirez Decl.)). *See also* Decl. of Julie Houk dated May 24, 2022, Ex. 1 ¶¶ 3, 5 (Decl. of Treaunna ("Aunna") Dennis dated May 24, 2022 (Dennis Decl.)); Ex. 2 ¶¶ 3-7 (Decl. of Gerald Griggs dated May 25, 2022).

marchers fled back to that church after being beaten on the Edmund Pettus Bridge. Jackson Decl. ¶ 9.  Plaintiffs were also active in Georgia, where "discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy." *Brooks v. State Bd. of Elections,* 848 F. Supp. 1548, 1560 (S.D. Ga. 1994). For example, AME churches in Georgia served as organizational centers for Black leaders of the Civil Rights Movement, such as when W.W. Law led mass meetings at St. Philip AME Church in Savannah to advocate for peaceful resistance to segregation.  Jackson Decl. ¶ 9.  Using food to express support has a long tradition in Black Southern communities, and some Plaintiff groups in the Deep South have long provided food for those participating in civil rights marches.  *See id.* ¶¶ 17-18; Briggins Decl. ¶ 19.[3]

Civic engagement for a more representative and just government remains a core tenet of Plaintiffs' missions.  That mission is manifest in many of Plaintiffs' community outreach activities, such as the AME Church's "Souls to the Polls" events, the Deltas' informational sessions on how to regain the right to vote after a felony conviction, and the Georgia Muslim Voter Project's and Women Watch

---

[3] *See also* Jackson, *Black Women and the Legacy of Food and Protest*, EATER.COM (July 10, 2020), https://www.eater.com/2020/7/10/21308260/black-women-and-the-legacy-of-food-and-protest-history; DuBose, *Feeding the Revolution: Food in Black Liberation Movements*, STORYMAPS (Dec. 1, 2020), https://storymaps.arcgis.com/stories/99b1e7ae89fe44e38cf9c68308edae83;  Ganaway, *Black Communities Have Always Used Food as Protest*, FOOD & WINE (June 4, 2020), https://www.foodandwine.com/news/black-communities-food-as-protest.

Afrika's language assistance for voters at the polls.  *See* Briggins Decl. ¶ 9; Cobham Decl. ¶ 4; Gaymon Decl. ¶¶ 5-6; Khabani Decl. ¶ 5; Kilanko Decl. ¶ 5.

Inequitably long lines offend Plaintiffs' core values by blunting the exercise of the hard-won right to vote.  *See, e.g.*, Jackson Decl. ¶¶ 8, 13.  To encourage community members to vote despite these burdens, and to publicly reaffirm the dignity of each voter in the face of continued obstacles, Plaintiffs provide queuing voters with water, food, personal protective equipment such as hand sanitizer and facial coverings, and other necessities while they stand in line.  *See* Briggins Decl. ¶¶ 15-16; Cobham Decl. ¶¶ 4-7; Dennis Decl. ¶¶ 6-8; Gaymon Decl. ¶¶ 6-8; Griggs Decl. ¶¶ 8-15; Khabani Decl. ¶¶ 4, 7, 9; Kilanko Decl. ¶¶ 5-8; Ramirez Decl. ¶¶ 4-7.  Plaintiffs often offer this support at sites with large numbers of voters of color, where lines are the longest.  *See, e.g.*, Gaymon Decl. ¶¶ 6, 10-11; Jackson Decl. ¶¶ 11-12.  Plaintiffs and other line relief providers ensure that voters understand their efforts are non-partisan and completely unconditional.  *See* Bray Decl. ¶ 11; Cobham Decl. ¶ 7; Gaymon Decl. ¶ 15; Paul Decl. ¶ 8; Ramirez Decl. ¶ 8.

These line relief activities are expressive, political acts.  As one volunteer puts it, providing food and water "expresses our gratitude for those fulfilling their civic responsibility and persevering against obstacles to participate in the political process."  Gaymon Decl. ¶ 8.  Another organizer explains that line relief allows her to tell voters that, in spite of long lines and other obstacles, they "have a community

that supports them in exercising their voting rights."  Cobham Decl. ¶ 4.  "The message is telling people that as a citizen, this is one of the most powerful weapons that you have"—it is a message of "strength to those standing in long lines."  Kilanko Decl. ¶¶ 6, 8.  This message carries particular weight in the context of Georgia's history of discrimination against Black voters.  *See* Jackson Decl. ¶¶ 17-18.  Indeed, another volunteer describes "line relief as a form of protest" against the government's failure to "alleviate these long wait times."  Lakin Decl. Ex. 11 ¶ 10 (Decl. of Monica Kinard dated May 9, 2022 (Kinard Decl.)).  "By ensuring that voters have the provisions they need to wait in long lines, our members show government officials that voters will overcome voter suppression measures that have been erected to make casting a ballot more burdensome for Black voters and other voters of color."  Jackson Decl. ¶ 17; *see also* Briggins Decl. ¶ 18.

Words alone cannot adequately convey the proactive messages communicated by line relief.  *See*, *e.g.*, Gaymon Decl. ¶ 9; Paul Decl. ¶ 7; Mayes Decl. ¶¶ 7-8; Kinard Decl. ¶¶ 8-9; Kilanko Decl. ¶ 8; Cobham Decl. ¶ 6.  "The act of line relief is special because it sends a message about participation in democracy and the importance of humanitarian assistance in a way that words could not capture."  Lakin Decl. Ex. 12 ¶ 8 (Decl. of Cy Mayes dated May 11, 2022).  Approaching voters to providing food and drink communicates the distinct message that you "took the time to thank and support them."  Bray Decl. ¶ 14.  It uniquely conveys to those voters

that they have dignity and the strength of their community behind them.  *See* Jackson

Decl. ¶ 15; Briggins Decl. ¶ 16.

Line relief volunteers report that their efforts are well received and understood

for the non-partisan messages they are.  *See* Gaymon Decl. ¶¶ 14-16; Paul Decl. ¶ 9;

Kinard Decl. ¶ 11; Ramirez Decl. ¶ 9; Cobham Decl. ¶ 7.  As one voter explains,

line relief "sent the message that my vote matters, that I had dignity as a voter, and

that I should keep standing in line to make sure my voice was heard in the political

process."  Lakin Decl. Ex. 17 ¶ 8 (Decl. of Hope Sims Sutton dated May 11, 2022

(Sutton Decl.)).  Other voters similarly report that they understand these messages.

*See* Kinard Decl. ¶ 16; Robinson Decl. ¶ 6; Lakin Decl. Ex. 18 ¶¶ 8-10 (Decl. of

Brenda Tharpe dated May 23, 2022 (Tharpe Decl.)).  For one voter, line relief was

not "just about the food and water—it was also the fact that I felt like my voice had

value in the democratic process."  Scott Decl. ¶ 10.  "Receiving the water, in

particular, was like receiving hope."  Clarke Decl. ¶ 9.

### C.    SB 202 Targets And Punishes Plaintiffs' Political Expression

SB 202 imposes a broad suite of voting restrictions, all rushed through shortly

after the 2020 elections.  Among many other restrictions, SB 202 imposes criminal

penalties on persons who "give, offer to give, or participate in the giving of any

money or gifts, including, but not limited to, food and drink, to an elector," even

with no conditions attached.   O.C.G.A. § 21-2-414(a).   These restrictions apply within 150 feet of a polling place or 25 feet of any voter in line.

SB 202 operates as an absolute ban on line relief where long lines wrap around polling places, always within 150 feet of the building, or where there are no publicly accessible spaces within 25 feet of the voters waiting further away.   Lines often extend into neighborhoods, where the only public spaces are the streets and sidewalks where voters are waiting in line.   *See, e.g.*, Clarke Decl. ¶ 6 (citing a video that shows, from 4:13 to 5:19, voting lines extending far into such neighborhoods).   In these settings, "any form of line relief will become functionally impossible" under SB 202.   Jackson Decl. ¶ 22.   Even where it is technically feasible, "voters might not realize that we are present near the polling place if we are so far away."   Bray Decl. ¶ 20.   Moreover, proactively approaching voters facilitates other communication.   It provides a mechanism for distributing non-partisan literature, Kinard Decl. ¶¶ 13, 15, Paul Decl. ¶ 8; offering translation services and resolving "simple, nonpartisan election administration issues," Khabani Decl. ¶¶ 5-6; verbally encouraging voters to stay in line, Gaymon Decl. ¶ 14; and letting them know they can vote if they are in line before polls close, Briggins Decl. ¶ 17, Jackson Decl. ¶ 16.

Nothing in the legislative record indicates past problems with the unconditional provision of food and water to voters by non-partisan volunteers. Before Georgia enacted SB 202, existing laws already prohibited vote buying, *see*

O.C.G.A. § 21-2-570; 18 U.S.C. § 597, and improper campaigning and election solicitation at polling places, *see* O.C.G.A. § 21-2-414.   Legislators pointed to nothing suggesting these laws were inadequate.   In the limited debate and testimony the legislature permitted, the evidence only highlighted that existing laws were sufficient to sanction a candidate for re-entering his polling place to personally hand out pizza and to prohibit food trucks from giving away food in exchange for promises to vote.   *See Meeting Before the S. Comm. on Ethics*, 2021 Leg., 156th Sess. 1:30:23-1:30:52 (Ga. 2021) (statement of Senator Sally Harrell); *Meeting Before the H. Comm. on Gov. Affairs*, 2020 Leg., 155th Sess. 36:44-37:46 (Ga. 2020) (statement of General Counsel for the Secretary of State).[4]   These were the only two examples in the legislative record, and existing laws fully addressed the conduct.

## ARGUMENT

A preliminary injunction issues when the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) injury to the movant that outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) the injunction would not be adverse to the public interest.   *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011).   Each factor decisively favors an injunction here.

---

[4] Videos of these respective statements are available at https://www.youtube.com/ watch?v=oWh0f1_2ork, and https://www.youtube.com/watch?v=gCjbPJLBI7c.

## I.     Plaintiffs Are Likely To Succeed On The Merits Of Their Claim

### A.     SB 202's Line Relief Ban Criminalizes Speech And Expressive Conduct That Is Protected Under The First Amendment

SB 202 makes it a crime to "offer to give" food and drink to voters waiting in line.  O.C.G.A. § 21-2-414(a).  That prohibition restricts both verbal speech and expressive conduct.  First, it is a direct restriction on traditional speech—particular words cannot be uttered without the threat of criminal sanction.  By criminalizing those words, the law undoubtedly imposes First Amendment burdens.

Second, the ban is a restriction on non-verbal communicative conduct. Constitutional protection for freedom of speech "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).  The First Amendment also protects "expressive conduct," meaning nonverbal acts intended to convey a message where "at least some" viewers would understand it to communicate *some* message, even if they would not "necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

Plaintiffs intend to communicate a message by supporting those waiting in line to vote.  Namely, they affirm the importance of voters choosing to stay in line and vote despite unreasonably long lines, and they celebrate historically disenfranchised voters' exercise of their hard-won franchise.  Providing sustenance and other support communicates the importance of voting and solidarity in the face of political obstacles in a way that words alone could not.  *See supra* pp. 4-8.

Those who observe Plaintiffs' line relief activities or receive their support understand them to be communicative. *See*, *e.g.*, Scott Decl. ¶¶ 8-10; Sutton Decl. ¶ 8; Robinson Decl. ¶ 6.   Context can transform acts that are "ordinarily not expressive," like "sitting down," into expressive conduct, like "the sit-in by African Americans at a Louisiana library which was understood as a protest against segregation." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) ("*FLFNB*") (citing *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966)).   The Eleventh Circuit has thus held that a nonprofit's food sharing events were "more than a picnic in the park" because they were accompanied by signs and were open to all, in a public park at a time when treatment of homeless individuals was "an issue of concern in the community." *Id.* at 1242-43.   In that context, "the reasonable observer would interpret [the] food sharing events as conveying *some* sort of message." *Id.* at 1243.   Conduct is particularly likely to be understood as expressive when it "is intertwined with speech and association." *League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006)).

Context likewise makes clear to observers of Plaintiffs' line relief activities that they are communicating a message.  Feeding the hungry and providing drink to the thirsty has symbolic "significance [that] dates back millennia." *FLFNB*, 901

F.3d at 1243; *see also Matthew* 25:35-45.  And Plaintiffs are not handing out food and water on just any Tuesday in any public place, but on voting days by approaching people waiting to vote.  Voting and voter turnout are quintessential "issue[s] of concern" in that context.  *FLFNB*, 901 F.3d at 1242.  Several Plaintiffs also engage in line relief activities in their own communities—Black communities in Georgia, where elderly voters experienced *de jure* disenfranchisement and others have long been subject to related burdens.  *See* Jackson Decl. ¶ 14; *see also* Khabani Decl. ¶¶ 7-8.  Long lines in these communities have been the subject of extensive news coverage and activism.[5]  And many volunteers who provide line relief accompany their offers with verbal expressions of gratitude, and the relief Plaintiffs provide is expressly "open to everyone."  *Id*.; *see also* Robinson Decl. ¶ 8.  That alone is sufficient for observers to understand this line relief to be expressive.

Moreover, "[i]t is quite reasonable to infer that at least some" Georgia voters observing majority-Black organizations well known for their social justice work providing line relief in neighborhoods with significant Black populations "would have recognized [that] act for what it was," *Holloman*, 370 F.3d at 1270—a message to voters that their vote matters, that they should stay in line, and that they are not

---

[5] *See, e.g.*, Gardner, Lee & Boburg, *Voting Debacle in Georgia Came After Months of Warnings Went Unaddressed*, WASH. POST (June 10, 2020); Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For Hours? Too Few Polling Places*, NPR (Oct. 17, 2020), https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-pl.

facing these barriers alone.   Indeed, many voters report understanding these messages.  *See*, *e.g.*, Scott Decl. ¶¶ 8-10; Sutton Decl. ¶ 8; Kinard Decl. ¶ 16.  At a minimum, the reasonable observer would understand Plaintiffs' line relief activities "as conveying *some* sort of message." *FLFNB*, 901 F.3d at 1243.

### B.   SB 202's Line Relief Ban Is Subject To Heightened First Amendment Scrutiny, Which It Cannot Survive

#### 1.   Strict Scrutiny Applies Because The Line Relief Ban Is A Content-Based Restriction Of Speech In A Public Forum

The First Amendment prohibits the government from restricting "expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  Content-based restrictions on speech in traditional public forums are subject to strict scrutiny and are presumptively unconstitutional.  *See*, *e.g.*, *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983); *United States v. Gilbert*, 920 F.2d 878, 884-85 (11th Cir. 1991).

#### i.   The Line Relief Ban Is A Content-Based Restriction

A regulation is content-based "under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U. S. 155, 163 (2015)).  Even a facially content-neutral restriction is nonetheless content based if the government restricts expression "because of disagreement with the message it conveys." *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 791 (1989); *see also Boos v. Barry*, 485 U.S. 312, 320 (1988) (describing "'content-neutral' speech restrictions as those that 'are *justified* without reference to the content of the regulated speech.'") (citation omitted); *City of Austin*, 142 S. Ct. at 1475 ("If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, … that restriction may be content based."). "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." *Reed*, 576 U.S. at 164.

The line relief ban specifically targets the speech and expressive conduct of non-partisan groups using sustenance to affirm the importance of voting. *See Burson v. Freeman*, 504 U.S. 191, 197 (1992) (plurality opinion) (holding that a statute prohibiting solicitation of votes and display of campaign materials within 100 feet of entrance to polling place was facially content based). Before SB 202, Georgia law already prohibited giving "gifts for the purpose of … voting, or voting for a particular candidate," O.C.G.A. § 21-2-570, as well as "solicit[ing] votes in any manner or by any means or method" or "distribut[ing] or display[ing] any campaign material," *id.* § 21-2-414(a). The specific prohibition on giving voters "food or drink" thus targets only one type of expressive conduct: the use of non-partisan line relief to celebrate and affirm the importance of political participation.

Moreover, the legislative record is devoid of meaningful support for the ban as a means of preventing inappropriate partisan influence, yet full of evidence

showing it is wildly overinclusive.  The ban thus makes little sense as a means of preventing undue influence, but it is perfectly tailored to silence those who seek to provide proactive, expressive, concrete support to voters waiting in line.  This means-end mismatch makes clear that the line relief ban specifically targets the messages communicated by Plaintiffs' line relief efforts, and so is content based.

The text of SB 202 itself further shows that the line relief ban is content based, as it purportedly justifies the law because of the importance of "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote." SB 202 at 6:126-129.  State Defendants have likewise argued that "offering or approaching voters with things of value almost certainly would be or could be seen as a pretext (or worse) for buying votes or conducting unlawful electioneering." Mot. to Dismiss, No. 21-cv-1284, Doc. No. 87-1 at 21.

This purported justification is wholly implausible given existing electioneering bans.  But even taking it as true, the ban is still explicitly intended to limit actions that "would be or could be seen" as communicating a particular message—a justification that "focuses only on the content of the speech and the direct impact that speech has on its listeners." *Boos*, 485 U.S. at 321.  Like straightforward electioneering bans, the line relief ban concededly targets a particular message for suppression and so is content based. *See Burson*, 504 U.S. at 198.  But unlike narrowly tailored electioneering restrictions like those at issue in

*Burson*, *see id.* at 208-11, the sweeping line relief ban does not survive strict scrutiny.  *See infra* Pt. I.C.

### ii.    The Line Relief Ban Suppresses Speech In A Traditional Public Forum

Public forums "include those places 'which by long tradition … have been devoted to assembly and debate,' such as parks, streets, and sidewalks," including those surrounding polling places.  *Burson*, 504 U.S. at 196 (plurality opinion); *see also McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (an act that "restricts access" to streets and sidewalks is "subject to First Amendment scrutiny" even if it "says nothing about speech").  Although the "interior of the building" of a polling place is not a public forum, *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018), the surrounding streets and sidewalks are.  In a controlling opinion, a plurality of the Supreme Court described a law restricting speech within 100 feet of a polling place as operating "in quintessential public forums."  *Burson*, 504 U.S. at 196; *see also Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1218 n.9 (11th Cir. 2009) (recognizing that this holding is binding).[6]

SB 202 criminalizes providing line relief "without concern as to whether the prohibition encompasses public streets, public sidewalks, public parks or other

---

[6] Courts in this circuit have consistently found that streets and sidewalks near polling places are public forums.  *See Fla. Comm. for Liab. Reform v. McMillan*, 682 F. Supp. 1536, 1541 (M.D. Fla. 1988); *CBS Inc. v. Smith*, 681 F. Supp. 794, 804 (S.D. Fla. 1988); *CBS Broad., Inc. v. Cobb*, 470 F. Supp. 2d 1365, 1369 (S.D. Fla. 2006).

traditionally public forums." *CBS Inc. v. Smith*, 681 F. Supp. 794, 802 (S.D. Fla. 1988). Many such public forums are within 150 feet of polling places, including the streets and sidewalks where Plaintiffs provide line relief. SB 202 also criminalizes providing line relief within 25 feet of any voter in line, no matter where the line stretches. Lines in Georgia often extend many blocks away from polling places, well into inarguably public forums. *See* Bray Decl. ¶¶ 17-18; Jackson Decl. ¶ 22.

### 2. Alternatively, The Line Relief Ban Requires Exacting Scrutiny Because It Burdens Election-Related Expression.

Even if the criminal ban on line relief were content neutral (it is not), it would still be subject to "exacting scrutiny" because it burdens election-related expression. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). Exacting scrutiny applies to laws that burden election-related expression even if citizens have "other means to disseminate their ideas," as the First Amendment protects a person's "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

The Supreme Court's decisions in *Meyer* and *Buckley* are instructive. *See id.*; *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999). Plaintiffs in each case challenged Colorado laws restricting their ability to gather petition signatures. *See Meyer*, 486 U.S. at 416-17 (prohibition on paying petitioner circulators); *Buckley*, 525 U.S. at 186 (disclosure requirements for petition circulators and requirement that they be registered voters and wear identification). The Court applied exacting

scrutiny in both cases, explaining that petition circulation was "'core political speech' because it involves 'interactive communication concerning political change.'" *Buckley*, 525 U.S. at 186 (quoting *Meyer*, 486 U.S. at 422). The policies "produce[d] a speech diminution" by "limit[ing] the number of voices" that could convey the message, and so required exacting scrutiny. *Id.* at 194-95.

The Supreme Court has also found that restrictions of other types of election-related expression—campaign expenditure limits, *see McCutcheon v. FEC*, 572 U.S. 185, 197 (2014), and a prohibition on anonymous campaign literature—were "limitation[s] on political expression subject to exacting scrutiny," *McIntyre*, 514 U.S. at 345-46. Other courts have applied exacting scrutiny to other laws that restrict election-related expression as well. *See, e.g.*, *ACLU of Fla., Inc. v. Lee*, 546 F. Supp. 3d 1096, 1102 (N.D. Fla. 2021) (campaign contributions); *Calzone v. Summers*, 942 F.3d 415, 422-23 (8th Cir. 2019) (en banc) (lobbying fee and disclosure requirements); *Hargett*, 400 F. Supp. 3d at 722 (voter registration drives); *Marin v. Town of Southeast*, 136 F. Supp. 3d 548, 566 (S.D.N.Y. 2015) (yard signs).

Encouraging voter participation, particularly among historically excluded communities, is "interactive communication concerning political change." *Meyer*, 486 U.S. at 422. Voting is the core of *all* political change. *See Yick Wo*, 118 U.S. at 370. "A petition in support of a ballot initiative might lead to a change in one law or a few laws, but a change in the composition of the electorate can lead to the change

of any law." *Hargett*, 400 F. Supp. 3d at 724.  That is true even for non-partisan advocacy.  Voting itself is a political act.  Advocating for voting, including by celebrating and supporting voters waiting in line, is thus core political expression at the heart of the First Amendment.

The ban on line relief burdens Plaintiffs' election-related expression by criminalizing conduct that communicates their support for the democratic process and belief that the popular will, including of disenfranchised communities, should shape the government.  Moreover, many of Plaintiffs' members weave line relief together with verbal speech, celebrating voters, thanking them for casting their vote, and informing them that they will be able to vote if they stay in line.  *See supra* p. 9.  SB 202 thus "reduces the quantity of expression" related to elections.  *McCutcheon*, 572 U.S. at 197 (quoting *Buckley v. Valeo*, 424 U.S. 1, 19 (1976)).  Plaintiffs' interactive communication concerning the bedrock political act of voting merits at least the same protection as discussions about "whether the trucking industry should be deregulated in Colorado."  *Meyer*, 486 U.S. at 421.  The criminal ban on line relief is thus subject to exacting scrutiny.

### 3.     At a Minimum, The Line Relief Ban Is Subject To Intermediate Scrutiny

Even if the Court determines that neither strict nor exacting scrutiny applies, SB 202 is, at a minimum, subject to intermediate scrutiny because it restricts communicative conduct in a traditionally public forum.  *See Fort Lauderdale Food*

*Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1294, 1297 (11th Cir. 2021)

("*FLFNB II*"); *United States v. O'Brien*, 391 U.S. 367, 382 (1968).

### C.    The Line Relief Ban Cannot Survive First Amendment Scrutiny Under Any Potentially Applicable Standard

Criminalizing the unconditional provision of food and water to voters waiting in line is unjustifiable no matter the level of First Amendment scrutiny.   Strict scrutiny, required because SB 202 is a content-based restriction on expression in a public forum, requires that the challenged law be "the least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478.  "The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Exacting scrutiny, required because the line relief ban burdens Plaintiffs' election-related expression, requires the State to prove that the challenged restriction bears a "substantial relation" to a "sufficiently important government interest." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010).  Courts will uphold a restriction on such expression "only if it is narrowly tailored to serve an overriding state interest." *McIntyre*, 514 U.S. at 347.  "[E]ven a 'legitimate and substantial' governmental interest 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (citation omitted).

Last, intermediate scrutiny, required because the ban restricts expression in a public forum even if it is content neutral, demands the restriction be "narrowly tailored to serve a significant governmental interest" that is unrelated to the communicative impact of the conduct. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Narrowly tailored regulations must "promote[] a substantial governmental interest that would be achieved less effectively absent the regulation," and cannot "burden substantially more speech than is necessary." *Ward*, 491 U.S. at 799.

Plaintiffs are substantially likely to succeed under any standard because SB 202 is nowhere near narrowly tailored to achieve even a substantial government interest, and so fails even intermediate scrutiny. State Defendants have identified "voter intimidation at polling locations" as the sole "burden[]" the line relief ban "sought to remedy." *See* Lakin Decl. Ex. 20 at 11-12 (State Defs.' Responses and Objections to CBC Pls.' First Interrogatories). But the freedom to offer a voter a bottle of water does not plausibly facilitate voter intimidation, and no voter would mistake that act of support for a threat. It makes no sense even in theory, and there certainly is no evidence connecting the government's means to this purported end.

Likewise, indiscriminately criminalizing all line relief—even clearly non-partisan and unconditional provision of *de minimis* value items—is not remotely narrowly tailored to further the State's interest in deterring vote buying or

electioneering near polling places.  There is no evidence that non-partisan providers of line relief intend to influence voters' choices or that voters confuse their support for solicitation.  Indeed, all evidence is to the contrary.  *See, e.g.*, Clarke Decl. ¶ 8; Scott Decl. ¶ 8; Sutton Decl. ¶ 10; Robinson Decl. ¶¶ 7-8; Tharpe Decl. ¶ 9.  Neither the former Chief of Elections of Fulton County nor the current election director of Douglas County ever learned of any improper electioneering or solicitation in the guise of line relief.  *See* Lakin Decl. Ex. 3 ¶ 9 (Decl. of Dwight C. Brower dated May 23, 2022 (Brower Decl.)); Lakin Decl. Ex. 22 134:3-135:10 (deposition testimony of Milton D. Kidd dated May 5, 2022 (Kidd Dep.)).

That is entirely unsurprising.  Plaintiffs and other line relief providers are not affiliated with any candidate or campaign, and they are careful to ensure that voters understand their support is non-partisan and unconditional.[7]  *See* Gaymon Decl. ¶ 15; Paul Decl. ¶ 8; Ramirez Decl. ¶ 8.  Moreover, snacks and water are of minimal pecuniary value and highly unlikely to be understood as an attempt to influence voter choice, much less to actually do so.

Even under content-neutral intermediate scrutiny, such a sweeping burden on expressive conduct can be justified only if it is necessary to achieve the asserted

---

[7] This distinguishes SB 202 from the regulations at issue in *Burson*, 504 U.S. at 210, which prohibited "vote solicitation" within 100 feet of a polling place.  Plaintiffs' line relief does not involve electioneering in any capacity.  *Burson* is not binding where the "material facts are different."  *Browning*, 572 F.3d at 1218.

government interests.  By contrast, "an abundance of targeted alternatives may indicate that a regulation is broader than necessary" and so cannot survive.  *FLFNB II*, 11 F.4th at 1296.  There are numerous such targeted alternatives here.

In the first place, electioneering close to polling places, vote buying, and voter intimidation are *already illegal*, and those laws have proven effective.  *See* O.C.G.A. §§ 21-2-414, 21-2-570, 21-2-566(3)-(4), 21-2-567.  There is no evidence in the legislative record that these comprehensive laws have failed to deter or detect improper electioneering or vote-buying.  The Legislature made no findings even *suggesting* that unconditional provision of food and water by volunteers unaffiliated with candidates or campaigns posed any threat to election integrity or could reasonably be expected to do so in the future.  To the contrary, the legislative record confirms that existing laws have fully sufficed.  *See supra* pp. 10-11.

By comparison, the Supreme Court found that statewide, 35-foot buffer zones at all clinics providing abortion care were not narrowly tailored to address a problem it believed occurred "only once a week in one city at one clinic."  *McCullen*, 573 U.S. at 493.  So, too, for a functional 25-foot buffer zone around each voter, as the only two violations the Legislature found were fully addressed under existing law. Given the effectiveness of laws already on the books, the government cannot show that the state's interest in preventing inappropriate influence "would be achieved less effectively" absent the line relief ban.  *Ward*, 491 U.S. at 799.

But even if, contrary to the evidence, *some* further prophylactic regulations were called for, SB 202 would still burden substantially more speech than is necessary." *Id.* The Court need not look far for "a model of a narrower regulation targeting more or less the same interests." *FLFNB II*, 11 F.4th at 1296. The few other states that regulate in this area at all either include exceptions for items of small pecuniary value, such as New York's law; limit line relief prohibitions to those acting on behalf of a candidate, such as Montana's; or criminalize activity only when conducted with the *intent* to influence a voter, such as Florida's. *See* N.Y. Elec. Law § 17-140; Mont. Code Ann. § 13-35-211; Fla. Stat. Ann. 102.031(4)(a), (b). SB 202 has no such tailoring. Rather, SB 202 amounts to an "outright ban on public food sharing," even less tailored than the ban struck down in *FLFNB II*. *See* 11 F.4th at 1296. If this severe ban were necessary to serve a substantial government interest, surely Georgia would not be the *only* state to have adopted something so draconian.

Similarly, non-partisan, unconditional line relief should not be subject to the same restrictions as electioneering. Yet SB 202 prohibits *both* within 150 feet of polling places *and* within 25 feet of voters waiting in line, even when the line extends well beyond the 150-foot buffer for electioneering and into public fora. *See* Bray Decl. ¶¶ 17-18; Jackson Decl. ¶ 22. As the Supreme Court has recognized, "[a]t some measurable distance from the polls, of course, governmental regulation of vote solicitation could effectively become an impermissible burden." *Burson*, 504 U.S.

at 210.  That radius is necessarily smaller as to regulations prohibiting expressive conduct, like line relief, that cannot plausibly be seen as vote solicitation.

SB 202 is not narrowly tailored to further the state's proffered interests and in fact does nothing to further those interests.  It is a pretext for restricting speech and expressive conduct concerning voter participation.  Because SB 202 is not narrowly tailored, it cannot survive even content-neutral intermediate scrutiny.  It certainly cannot survive strict or exacting scrutiny, which are the appropriate standards.  *See, e.g.*, *Fed. Election Comm'n v. Ted Cruz for Senate*, ---S. Ct.---, 2022 WL 1528348, at *9 (U.S. May 16, 2022) (the government must "point to record evidence or legislative findings demonstrating the need to address a special problem" and cannot "simply posit the existence of the disease sought to be cured") (citations omitted).  Plaintiffs are therefore likely to succeed on the merits.

## II.   The Remaining Factors Weigh Heavily In Plaintiffs' Favor

Each remaining factor decidedly favors granting a preliminary injunction, as plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [their] favor," and "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### A.   The Deprivation Of First Amendment Freedoms Is A Quintessential Irreparable Harm

Even the *threat* of impairment of First Amendment interests, "for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v.*

*Burns*, 427 U.S. 347, 373-74 (1976).  That principle applies with particular force where, as here, the protected expression involves a timely matter of public concern, such as encouraging voter participation.  *See id.* at 374 & n.29.  SB 202 will severely burden Plaintiffs' First Amendment rights.  Their message of concrete support and community cannot be conveyed by words alone, and a 25-foot buffer zone often amounts to a total ban, and in any event compromises Plaintiffs' ability to initiate "close, personal" interactions that are "essential" to disseminating their message. *McCullen*, 573 U.S. at 487.  Criminalizing this core expressive conduct is a paradigmatic irreparable harm.

### B.    The Balance Of Hardships Tips Strongly In Plaintiffs' Favor

An injunction would pose little to no hardship to Defendants.  The November 2022 elections are many months away.  Indeed, when asked, the State Defendants pointed to *no* specific "election administration burden[]" should the Court enjoin SB 202's ban on line relief.  *See* Lakin Decl. Ex. 20 11-12.  That makes sense.  If the line relief ban is enjoined, election administrators need only *passively* allow the provision of food and water to voters—common practice in Georgia for decades.

Even if a preliminary injunction imposed some limited burden on Defendants, there are almost six months before November's elections, and instructing poll workers and election administrators to return to a decades-long status quo would constitute at most a "modest administrative burden[]."  *Fish v. Kobach*, 840 F.3d

710, 754-55 (10th Cir. 2016).  According to the former Chief of Elections in Fulton County, the most populous county in the state, prohibiting enforcement of SB 202's line relief ban "could be done close in time to an election without significant cost, confusion, or hardship on the administration of elections."  Brower Decl. ¶ 11.  And this injunction need not issue close in time to an election, further reducing any hypothetical burden.  In any event, administrative burdens cannot trump Plaintiffs' constitutional rights.  *See Fish*, 840 F.3d at 755; *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2018); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015).

### C.    A Preliminary Injunction Is In The Public Interest

Finally, "injunctions protecting First Amendment freedoms are always in the public interest."  *Texans for Free Enter. v. Tex. Ethics Comm'n,* 732 F.3d 535, 539 (5th Cir. 2013).  Likewise, protection of "franchise-related rights is without question in the public interest."  *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).  And "[n]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]."  *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (same).

### III.   The *Purcell* Principle Does Not Apply And In Any Event Does Not Preclude The Limited Relief Sought Here

The Supreme Court has recognized that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).  This "*Purcell* principle" requires more demanding scrutiny of last-minute changes to election laws that "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5; *see also League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, --- F.4th ---, 2022 WL 1435597, at *3 (11th Cir. May 6, 2022) (non-precedential stay order).  Justice Kavanaugh, in a recent concurrence joined by Justice Alito, described the *Purcell* principle's application as depending in part on "how easily the State could make the change without undue collateral effects.  Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring).

Under this reasoning, the *Purcell* principle should not apply.  Earlier this year, the Supreme Court ordered entirely new maps for the Wisconsin State Assembly and Senate in advance of the primary elections that were just over four months later. *See Wisc. Legis. v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022).  Drawing entirely new maps "is a prescription for chaos for candidates, campaign organizations, independent groups, political parties, and voters, among others."

*Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).  But the Supreme Court did not apply the *Purcell* principle in that case—indeed, it did not even mention *Purcell*.

The November 2022 elections will not be held for more than five months. Unlike in *League of Women Voters*, "local elections" are not "ongoing," and an injunction would not "implicate[] voter registration" or anything else that is "currently underway."  2022 WL 1435597, at *3.  Enjoining the line relief ban will involve minimal burdens, and certainly nothing nearly akin to redrawing legislative maps.  Indeed, it would not require election administrators to *do* anything—it would require no changes to voting processes or election machinery, and election administrators need only return to the status quo from prior election cycles and *refrain* from enforcing a criminal ban.  *Cf. Ga. Latino All. for Hum. Rights v. Deal*, 793 F. Supp. 2d 1317, 1340 (N.D. Ga. 2011) ("[B]y merely preserving the status quo, [the] injunction will impose no new and onerous burdens on the Defendants."), *aff'd in part & rev'd in part on other grounds*, 691 F.3d 1250 (11th Cir. 2012).

For example, the Spalding County Defendants identified no particular burdens in implementing a preliminary injunction against the line-relief ban, noting only that they "would not interfere with efforts by non-poll workers to distribute food or water if a Court Order so requires."  Lakin Decl. Ex. 21 at 9 (Spalding Defs.' Resp. to Pls. First Interrogatories at 9).  According to the former Fulton County Chief of Elections, lifting the ban "would not be burdensome on election workers or to the

voters and could be implemented close in time to an election."  Brower Decl. ¶ 10.
And the election director of Douglas County observed that it "was very useful for
Douglas County to be able to have external organizations" provide line relief.  Kidd.
Dep. 37:3-10.  Finally, and crucially, enjoining the ban will not confuse voters, as it
would not affect what they need to know to cast their ballot.  *See, e.g.*, Clarke Decl.
¶ 11.  An injunction certainly would not lead to confusion that might incentivize
voters to stay home.  *See Purcell*, 549 U.S. at 4-5.

Even if the *Purcell* principle does apply, the injunction should still issue.[8]  As
shown, Plaintiffs will "suffer irreparable harm absent the injunction" and "the
changes in question are at least feasible before the election without significant cost,
confusion, or hardship."  *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J. concurring).
Plaintiffs have "not unduly delayed bringing the complaint to court," *id.*, as they
initiated this action on March 29, 2021—just four days after Governor Kemp signed
SB 202 into law, *see* https://www.legis.ga.gov/legislation/59827—and Plaintiffs
moved for a preliminary injunction promptly after obtaining the necessary discovery
and five months before the general election.

---

[8] *Cf. League of Women Voters*, 2022 WL 1435597, at *1, *3 & n.1 (in an expressly
non-binding opinion, applying *Purcell* to an injunction against a Florida law
prohibiting "solicitation" with intent to affect voters near polling places).

Last, and as shown above, "the underlying merits are entirely clearcut in favor of the plaintiff[s]." *Merrill*, 142 S. Ct. at 881. The decision in *League of Women Voters* underscores the point. *See* 2022 WL 1435597, at *5-6. There, the district court enjoined a law prohibiting "engaging in any activity with the intent to influence or effect of influencing a voter," finding that it was both unconstitutionally vague and overbroad. *Id.* at *5. While the panel found that to be a "close[] call," it ultimately stayed that injunction because it found that the merits panel "might determine that the language the district court found problematic is limited by the surrounding examples of prohibited conduct," and that the district court's overbreadth ruling may have "failed to contend with any of the 'plainly legitimate' applications" of the law. *Id.* at *6. Not so here. Plaintiffs do not make a void-for-vagueness or overbreadth argument. And in any event, SB 202 sweeps far more broadly than the Florida provision at issue in that case, which was limited to actions *intended* to affect voters.

More importantly, the Eleventh Circuit panel found no fault with the district court's finding that line relief is expressive conduct. *See League of Women Voters of Fla., Inc. v. Lee*, --- F. Supp. 3d ---, 2022 WL 969538, at *62-65 (N.D. Fla. Mar. 31, 2022) (line relief activities "communicate[d] to ... voters that their determination to exercise the franchise is important and celebrated"). Nor could it, given clear precedent in this circuit and from the Supreme Court. *See supra* Pt. I.A.

The line relief ban is a wholly unjustified and unjustifiable bar on expressing messages of concrete support and encouragement to voters waiting in line to cast a ballot.  It is a ban on giving an elderly voter handwarmers, not just so her hands don't turn blue, but also to affirm that her individual vote matters to more than just her.  It is a ban on handing a hungry voter a granola bar, not only to feed him, but also to fill him with a sense of pride and duty.  It is a ban on giving a thirsty voter something to drink to celebrate her civic-minded decision to make sure her voice is heard, no matter the obstacles.  These actions, and this message, are part of what makes the great American experiment work.  If anything threatens election integrity in Georgia, it is the law that treats these messengers like criminals.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted, this 25th day of May, 2022.

/s/ *Pichaya Poy Winichakul*
Bradley E. Heard (Ga. Bar No. 342209)
*bradley.heard@splcenter.org*
Pichaya Poy Winichakul (Ga. Bar 246858)
*poy.winichakul@splcenter.org*
Nancy G. Abudu (Ga. Bar No. 001471)
*nancy.abudu@splcenter.org*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

/s/ *Adam S. Sieff*
Adam S. Sieff (pro hac vice)
*adamsieff@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

David M. Gossett (pro hac vice)
*davidgossett@dwt.com*
Courtney T. DeThomas (pro hac vice)
*courtneydethomas@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C.  20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

Kate Kennedy (pro hac vice)
*katekennedy@dwt.com*
Matthew Jedreski (pro hac vice)
*mjedreski@dwt.com*
Grace Thompson (pro hac vice)
*gracethompson@dwt.com*

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
*drosborough@aclu.org*
Jonathan S. Topaz
*jtopaz@aclu.org*
Dale E. Ho (pro hac vice)
*dho@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA,
INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Jordan Harris (pro hac vice)
*jordanharris@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

*Attorneys for Plaintiffs*
*Georgia Muslim Voter Project, Women*
*Watch Afrika, Latino Community Fund*
*Georgia, and The Arc of the United States*

*/s/ Bryan L. Sells*
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum (pro hac vice)
Ezra D. Rosenberg (pro hac vice)
Julie M. Houk (pro hac vice)
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
Lawyers' Committee for Civil Rights
    Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
Neil Oxford (pro hac vice)
Gregory Farrell (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza

*/s/ Leah C. Aden*
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

*/s/ Debo P. Adegbile*
Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Ilya Feldsherov (pro hac vice)
*ilya.feldsherov@wilmerhale.com*
WILMER CUTLER PICKERING
    HALE  AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW

New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for Plaintiffs Georgia State
Conference of the NAACP, Georgia
Coalition for the People's Agenda, Inc.,
League of Women Voters of Georgia, Inc.,
GALEO Latino Community Development
Fund, Inc., Common Cause, and Lower
Muskogee Creek Tribe*

Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
  HALE  AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs
Sixth District of the African Methodist
Episcopal Church, Delta Sigma Theta
Sorority, Georgia ADAPT, Georgia
Advocacy Office, and Southern Christian
Leadership Conference*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated:  May 25, 2022                    /s/ *Leah C. Aden*
                                                   Leah C. Aden
                                                   *Counsel for Plaintiffs*


## **CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated:  May 25, 2022                    /s/ *Leah C. Aden*
                                                   Leah C. Aden
                                                   *Counsel for Plaintiffs*